EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Roberto Jiménez Soto y otros<br><br>Recurridos<br><br>v.<br><br>Carolina Catering Corp. h/n/c Sky Caterers; Management Group Investors, LLC<br><br>Peticionarios | Certiorari<br><br>2025 TSPR 3<br><br>215 DPR ___ |

Número del Caso:  CC-2023-0733


Fecha:  14 de enero de 2025


Tribunal de Apelaciones:

     Panel X

Representantes legales de la parte peticionaria:

     Lcdo. Reynaldo A. Quintana Latorre
     Lcda. Ashley D. Martínez Rivera

Representantes legales de la parte recurrida:

     Lcdo. David Noriega Costas

Materia: Derecho Laboral - El término origen nacional bajo la Ley Núm. 100, Ley contra el Discrimen en el Empleo, no contempla discrimen por razón de ciudadanía o estatus migratorio; aplicación de la doctrina de la inferencia del mismo actor.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Roberto Jiménez Soto y otros<br><br>    Recurridos<br><br>        v.<br><br>Carolina Catering Corp. h/n/c Sky Caterers; Management Group Investors, LLC<br><br>    Peticionarios | CC-2023-733 | *Certiorari* |

El Juez Asociado Señor Feliberti Cintrón emitió la Opinión del Tribunal.

En San Juan, Puerto Rico, a 14 de enero de 2025.

Tenemos la ocasión de resolver si un empleado que ha sido despedido porque su tarjeta de residencia permanente se encontraba vencida fue víctima de discrimen por razón de su origen nacional, reclamable al amparo de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como Ley contra el Discrimen en el Empleo (Ley Núm. 100), 29 LPRA sec. 146 *et seq.* En particular, este caso nos brinda la oportunidad de interpretar el término "origen nacional" según la Ley Núm. 100, y precisar el esquema probatorio aplicable a dicha legislación ante las enmiendas introducidas por la Ley Núm. 4-2017, conocida como Ley de

Transformación y Flexibilidad Laboral (Reforma Laboral o Ley Núm. 4).

Adelantamos que el término "origen nacional" bajo la Ley Núm. 100 no contempla el discrimen por razón de "ciudadanía" o "estatus migratorio". Asimismo, determinamos que, a la luz del esquema probatorio desarrollado por el Tribunal Supremo de Estados Unidos en McDonnell Douglas Corp. v. Green, *infra*, y su progenie, y la aplicación de la doctrina de la inferencia del mismo actor, no se logró demostrar el propósito o efecto discriminatorio por razón de origen nacional en el empleo. En consecuencia, revocamos la *Sentencia* emitida por el Tribunal de Apelaciones, así como la *Sentencia parcial* dictada por el Tribunal de Primera Instancia, y ordenamos la desestimación de la demanda en cuestión.

A continuación, exponemos el trasfondo fáctico y procesal que dio origen al presente caso.

I

Este caso comenzó el 25 de febrero de 2020 cuando el Sr. Roberto Jiménez Soto (señor Jiménez Soto o recurrido), la Sra. Diana Morales y la Sociedad Legal de Gananciales compuesta por ambos (en conjunto, parte recurrida) presentaron una *Demanda* sobre discrimen por razón de origen nacional, y daños y perjuicios,[1] en contra de Carolina

---

[1] Cabe mencionar que dicha *Demanda* no contenía causa de acción alguna por despido injustificado bajo la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como Ley de Indemnización por Despido sin Justa Causa, 29 LPRA sec. 185a *et seq*.

Catering Corp. h/n/c Sky Caterers y Management Group Investors, LLC (Sky Caterers o parte peticionaria).**2** El señor Jiménez Soto, quien es ciudadano de la República Dominicana y residente legal permanente de Estados Unidos, adujo que la parte peticionaria lo despidió discriminatoriamente de su empleo por razón de su origen nacional o condición social al ser percibido y tratado como un inmigrante ilegal.

En particular, el señor Jiménez Soto alegó que Sky Caterers conocía su origen nacional cuando fue contratado para proveer servicios de alimentos el 30 de junio de 2018 y que, además, estaba al tanto de que su tarjeta de residencia permanente expiraría el 17 de julio de 2018. Así pues, indicó que la parte peticionaria lo despidió, efectivo el 18 de julio de 2018, al concluir que "no estaba autorizado a trabajar en los Estados Unidos o sus territorios" debido a que su tarjeta de residencia permanente (*Green Card*) había expirado.**3** De igual forma, sostuvo que actuó en contra de sus propias normas y políticas, pues no le brindó la oportunidad de contactar a las agencias federales correspondientes ni le proveyó las instrucciones escritas sobre cómo proceder bajo el supuesto

---

**2**    El 6 de agosto de 2018, el Sr. Roberto Jiménez Soto (señor Jiménez Soto o recurrido) presentó una querella administrativa ante la Comisión de Igualdad de Oportunidades en el Empleo (EEOC, por sus siglas en inglés), en la cual alegó que fue despedido de manera discriminatoria por razón de su origen nacional. Posteriormente, a petición de éste, la EEOC archivó administrativamente la querella y expidió una autorización para instar una demanda. *Demanda*, Apéndice del *certiorari*, pág. 59.

**3**    Íd., pág. 58.

de que no se pudiera confirmar su elegibilidad para trabajar. Por ende, la parte recurrida reclamó una indemnización al amparo de la Ley Núm. 100 y el Art. 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 5141 (ed. 2015).

Por su parte, Sky Caterers presentó una *Contestación a la demanda* el 15 de julio de 2020. En resumen, negó las alegaciones en su contra y adujo que despidió al señor Jiménez Soto porque no contaba con la autorización necesaria para entrar a su área de trabajo en el Aeropuerto Internacional Luis Muñoz Marín. Argumentó que la compañía administradora del aeropuerto, Aerostar Airport Holdings, LLC (Aerostar), requería que el recurrido presentara su tarjeta de residencia renovada para poder brindarle la identificación con el acceso correspondiente. Así las cosas, la parte peticionaria alegó que no hubo ánimo discriminatorio en el despido y que el señor Jiménez Soto no mitigó sus daños, ya que rechazó ser reinstalado al puesto cuando posteriormente renovó su tarjeta de residencia.

Después de varios trámites procesales relacionados con el descubrimiento de prueba, Sky Caterers presentó una *Moción de sentencia sumaria* el 10 de febrero de 2021. En síntesis, señaló que no existían hechos medulares en controversia y que la *Demanda* del señor Jiménez Soto no procedía en derecho, debido a la ausencia de un caso *prima facie* de discrimen. En la alternativa, la parte

peticionaria argumentó que aun de entenderse que se estableció un caso *prima facie* de discrimen, el despido del recurrido estaba justificado debido a que su tarjeta de residencia había expirado y la legislación federal prohibía retener en el empleo a un extranjero sin autorización para trabajar en Estados Unidos. Igualmente, aseveró que contrató al señor Jiménez Soto sin tomar en cuenta su nacionalidad y reafirmó que éste rechazó la oferta que se le extendió para ser reinstalado a su puesto una vez renovó su tarjeta de residencia. Por tanto, Sky Caterers afirmó que el despido no fue discriminatorio y que estuvo justificado, por lo cual solicitó la desestimación de la *Demanda*.

Posteriormente, el 8 de marzo de 2021 el señor Jiménez Soto presentó una *Oposición a moción de sentencia sumaria y solicitud de sentencia sumaria a favor de la parte demandante*. En su escrito, planteó que su despido estaba relacionado directamente con su origen nacional y estatus de ciudadanía y que, independientemente de que su tarjeta de residencia expirara, siempre conservó la autorización para trabajar en Puerto Rico por ser un residente legal permanente. En consecuencia, el recurrido expuso que la parte peticionaria no estableció una razón legítima para justificar su despido.

Asimismo, el señor Jiménez Soto alegó que la prueba del discrimen de Sky Caterers era directa, por lo que el esquema probatorio para establecer un caso *prima facie* de

discrimen no aplicaba. En la alternativa, sostuvo que se presentó prueba suficiente para demostrar un caso *prima facie* de discrimen por razón de origen nacional y estatus de ciudadanía, ya que la parte peticionaria no lo hubiese despedido si su tarjeta de residencia no hubiera expirado. Por ende, solicitó que se dictara sentencia sumaria a su favor.

Luego de múltiples incidencias procesales,[4] el Tribunal de Primera Instancia emitió una *Sentencia parcial* el 2 de mayo de 2023,[5] en la cual consignó ochenta y cinco (85) determinaciones de hechos incontrovertidos. El foro primario determinó que Sky Caterers discriminó en contra del recurrido por razón de su origen nacional al despedirlo, pues, aunque su tarjeta de residencia se encontraba expirada, su estatus de residencia y su autorización para trabajar se mantuvieron vigentes. Estimó que el señor Jiménez Soto no hubiese sido despedido incorrectamente de no haber sido por su origen nacional y estatus migratorio. En específico, destacó que al

---

[4] Cabe destacar que, en un inicio, el Tribunal de Primera Instancia determinó que carecía de jurisdicción bajo el fundamento de que la reclamación objeto del litigio versaba sobre discrimen en el empleo por estatus migratorio, por lo cual debió ser presentada ante el foro que presuntamente ostentaba jurisdicción exclusiva para atender la misma, a saber: el *Inmigrant and Employee Rigths Section* o, en la alternativa, *The Office of the Chief Administrative Hearing Officer*. No obstante, el Tribunal de Apelaciones revocó este dictamen al concluir que el foro de primera instancia podía adjudicar las reclamaciones sobre discrimen por origen nacional o condición social expuestas en la *Demanda* al amparo de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como Ley contra el Discrimen en el Empleo (Ley Núm. 100), 29 LPRA sec. 146 *et seq*. Véase *Sentencia del Tribunal de Apelaciones*, Apéndice del *certiorari*, pág. 483.

[5] El archivo en autos de copia de la *Sentencia parcial* fue el 3 de mayo de 2023.

recurrido no se le hubiera requerido renovar innecesariamente un documento de no haber sido por el origen nacional y el estatus migratorio que posee. Así pues, el foro de primera instancia expuso en la *Sentencia parcial* lo siguiente:

> El que el patrono haya justificado su acción de despedir en el 2018 verbalizando que lo hacía por[que] la tarjeta estaba expirada es prueba directa de discrimen, y si hubiera alguna duda, el que se sostengan en esa defensa en sus escritos alegando que es justa causa la tarjeta expirada, cuando el derecho dirige claramente a lo contrario, lo confirma.[6]

Aun así, el Tribunal de Primera Instancia aplicó el esquema probatorio desarrollado jurisprudencialmente en la esfera federal. Al respecto, concluyó que la parte recurrida estableció un caso *prima facie* de discrimen y que Sky Caterers no logró rebatir la presunción de discrimen, ya que la razón ofrecida por este último para el despido era incorrecta en derecho. Por tal razón, declaró con lugar la solicitud de sentencia sumaria presentada por el señor Jiménez Soto y ordenó la continuación de los procedimientos para que se presentara prueba sobre los daños alegados. En desacuerdo, la parte peticionaria presentó una moción de reconsideración en la cual reiteró que conocía del origen nacional del recurrido al momento de su contratación y planteó el argumento de que la compañía administradora del aeropuerto fue la que

---

[6] *Sentencia parcial del Tribunal de Primera Instancia*, Apéndice del *certiorari*, pág. 51.

requirió la renovación de la tarjeta de residencia para producir la identificación del acceso aeroportuario. Posteriormente, el foro primario proveyó no ha lugar a esta moción.

Inconforme con el dictamen emitido por el Tribunal de Primera Instancia, el 10 de julio de 2023 Sky Caterers presentó un *Recurso de apelación* ante el Tribunal de Apelaciones. En resumen, argumentó que en la presente causa de acción no se logró establecer un caso *prima facie* de discrimen de acuerdo con el esquema probatorio formulado en McDonnell Douglas Corp. v. Green, 411 US 792 (1973), y que la conclusión de que hubo discrimen era especulativa. Por su parte, el señor Jiménez Soto presentó un *Alegato en oposición al recurso de apelación*, en el cual reiteró sus argumentos.

Así las cosas, el foro apelativo intermedio confirmó la determinación del foro de primera instancia mediante una *Sentencia* emitida el 11 de octubre de 2023. Tras analizar la normativa sobre "extranjeros y nacionalidad" bajo el Código de Regulaciones Federales (CFR, por sus siglas en inglés),[7] el Tribunal de Apelaciones manifestó lo siguiente:

> Ciertamente, el requerir la presentación de una tarjeta de residente vigente como método para elegibilidad de empleo, sin siquiera constatar que ante la expiración de esta el estado de elegibilidad del apelado había

---

[7] El Tribunal de Apelaciones hizo referencia a la sec. 274a.12 del Título 8 del Código de Regulaciones Federales. Véase *Sentencia del Tribunal de Apelaciones*, Apéndice del *certiorari*, págs. 16-17.

cambiado, es un acto incorrecto. Esto es así, ya que según establece el Formulario I-9, éstos no podían especificar el tipo de documento que el empleado debía presentar. Recordemos que el apelado había sometido documentos a los fines de constatar su elegibilidad para empleo. Sin embargo, exigieron la presentación de un documento específico. Ello, a nuestro juicio demuestra un ánimo discriminatorio.

Más a[ú]n, del estatuto antes transcrito queda claro que un residente permanente cuya tarjeta expiró no queda desautorizado por tal hecho para trabajar. Siendo ello así, los actos de los apelantes para con el apelado lo que realmente demostraron fue que, la decisión del despido estuvo basada exclusivamente por motivos discriminatorios contra el señor Jiménez por razón de su nacionalidad.[8]

Inconforme con la decisión del foro apelativo intermedio, el 10 de noviembre de 2023 la parte peticionaria presentó ante este Tribunal una *Petición de certiorari* mediante la cual señaló el error siguiente:

Erró el Tribunal de Apelaciones al confirmar la Sentencia del Tribunal de Primera Instancia[,] la cual determinó ánimo discriminatorio por parte del patrono y determinar que el demandante cumplió con establecer un caso *prima facie* de un caso de discrimen según el esquema probatorio aplicable en Puerto Rico para estos casos.[9]

Después de expedir el recurso de *certiorari* solicitado por Sky Caterers, y con el beneficio de la comparecencia de ambas partes, el caso quedó sometido el 29 de abril de 2024. Procedemos, entonces, a exponer el derecho aplicable.

---

[8] *Sentencia del Tribunal de Apelaciones*, Apéndice del *certiorari*, pág. 17.

[9] *Petición de certiorari*, pág. 7.

## II

### A. La moción de sentencia sumaria

Como es conocido, la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, regula todo lo concerniente a la moción de sentencia sumaria. *Cruz, López v. Casa Bella y otros*, 2024 TSPR 47, 213 DPR ___ (2024). Esta herramienta procesal permite la solución rápida, justa y económica de los casos en los que no existen hechos materiales en controversia que hagan necesaria la celebración de un juicio, por lo cual sólo resta aplicar el derecho. *Íd.*; *Oriental Bank v. Caballero García*, 2023 TSPR 103, 212 DPR ___ (2023); *Meléndez González et al.* v. M. Cuebas, 193 DPR 100, 109 (2015). Por ende, es importante que de la prueba que acompaña la solicitud de sentencia sumaria surja de manera preponderante la inexistencia de controversia sobre los hechos medulares del caso. *Cruz, López v. Casa Bella y otros, supra*; *Aponte Valentín et al.* v. Pfizer Pharm., 208 DPR 263, 277 (2021); *Zambrana García v. ELA et al.*, 204 DPR 328, 341-342 (2020).

En particular, la Regla 36.3(e) de Procedimiento Civil, *supra*, dispone que un tribunal dictará sentencia sumariamente si "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que como cuestión de derecho el tribunal debe dictar

sentencia sumaria a favor de la parte promovente". **Hemos expresado que un hecho material es aquel que puede alterar la forma en que se resuelve una reclamación, de acuerdo con el derecho sustantivo aplicable.** Cruz, López v. Casa Bella y otros, *supra*; Zambrana García v. ELA *et al.*, *supra*, pág. 341. Por tal razón, la parte que promueva la sentencia sumaria tiene el deber de exponer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material. Oriental Bank v. Caballero García, *supra*; Meléndez González *et al.* v. M. Cuebas, *supra*, pág. 110.

Por otra parte, este Tribunal ha manifestado que no es aconsejable el uso de la moción de sentencia sumaria en casos en los que hay controversia sobre elementos subjetivos, de intención, propósitos mentales, negligencia o asuntos de credibilidad. Aponte Valentín *et al.* v. Pfizer Pharm., *supra*, pág. 278; Ramos Pérez v. Univisión, 178 DPR 200, 219 (2010). No obstante, hemos reconocido que "esto no impide utilizar el mecanismo de sentencia sumaria en reclamaciones que requieren elementos subjetivos o de intención —como pasa en un caso de discrimen— cuando de los documentos a ser considerados en la solicitud de sentencia sumaria surge que no existe controversia en cuanto a los hechos materiales". Ramos Pérez v. Univisión, *supra*. Consecuentemente, "[l]os hechos que surgen de los casos de alegado discrimen en el empleo, deben ser 'rigurosamente examinados por los tribunales con

un análisis detenido y cuidadoso'". Segarra Rivera v. Int'l. Shipping *et al.*, 208 DPR 964, 980-981 (2022) (citando a Soto v. Hotel Caribe Hilton, 137 DPR 294, 301 (1994)).

Por último, es norma reiterada que los foros apelativos nos encontramos en la misma posición que los foros de primera instancia al evaluar la procedencia de una sentencia sumaria. Cruz, López v. Casa Bella y otros, *supra*; Birriel Colón v. Econo y otro, 2023 TSPR 120, 213 DPR ___ (2023); Oriental Bank v. Caballero García, *supra*. Sin embargo, nuestra función se limita a: (1) considerar los documentos que se presentaron ante el foro de primera instancia; (2) determinar si existe alguna controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó de forma correcta. Birriel Colón v. Econo y otro, *supra*; Segarra Rivera v. Int'l. Shipping *et al.*, *supra*, pág. 981; Meléndez González *et al.* v. M. Cuebas, *supra*, págs. 114-116. De esta forma, los tribunales revisores estamos llamados a examinar el expediente *de novo* de la manera más favorable hacia la parte que se opone a la solicitud de sentencia sumaria en el foro primario y realizando todas las inferencias permisibles a su favor. Birriel Colón v. Econo y otro, *supra*.

**B. Ley contra el Discrimen en el Empleo**

**1. Introducción**

La Constitución de Puerto Rico dispone que "[n]o podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas". Art. II, Sec. 1, Const. PR, LPRA, Tomo 1. Estas prohibiciones son un reflejo de los grandes pilares en los que se fundamenta nuestro ordenamiento constitucional.[10] Entre estos, que la dignidad del ser humano es inviolable y que todas las personas son iguales ante la ley. Íd. En esa misma línea, la Asamblea Legislativa procuró encarnar estos principios en el contexto obrero-patronal mediante la aprobación de la Ley Núm. 100.

Con el fin de brindar una protección eficaz en la relación de empleo, esta ley le impone responsabilidad civil y criminal a todo patrono que discrimine en contra de todo aspirante de empleo o empleado. En específico, el Art. 1 de la Ley Núm. 100, 29 LPRA sec. 146, expone que incurrirá en responsabilidad civil

> [t]odo patrono que despida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o

---

[10] En referencia a las clasificaciones inherentemente sospechosas, este Tribunal integró el término "nacionalidad" por primera vez a la lista del Art. II, Sec. 1, de la Constitución de Puerto Rico en Wackenhut Corp. v. Rodríguez Aponte, 100 DPR 518, 531 (1972). Véanse, además: De Paz Lisk v. Aponte Roque, 124 DPR 472, 485 (1989); León Rosario v. Torres, 109 DPR 804, 813 (1980); Zachry International v. Tribunal Superior, 104 DPR 267, 279 (1975).

> clasifique sus empleados en cualquier forma que tienda a privar una persona de oportunidades de empleo o que afecten su [e]status de empleado, por razón de edad, según ésta se define más adelante, raza, color, sexo, orientación sexual, identidad de género, origen social o nacional, condición social, afiliación política, o ideas políticas o religiosas, o por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, o por ser militar, ex-militar, servir o haber servido en las Fuerzas Armadas de los Estados Unidos o por ostentar la condición de veterano del empleado o solicitante de empleo.

Debemos mencionar que la disposición vigente incluye categorías que no se encuentran en el texto constitucional y que tampoco fueron contempladas en la ley originalmente. Garib Bazaín v. Hosp. Aux. Mutuo *et al.*, 204 DPR 601, 616 (2020). En lo pertinente, la prohibición de discrimen por razón de **origen nacional** fue incluida mediante la Ley Núm. 67 de 3 de junio de 1983. En aquel momento, la Asamblea Legislativa entendió que la Ley Núm. 100, *supra*, no ofrecía una protección contra el discrimen en el empleo por razón de origen nacional, pues el término "origen o condición social" era utilizado de manera indistinta y no como conceptos separados con significados diferentes.[11] Al añadir esta nueva categoría, los miembros de la Asamblea Legislativa tuvieron la intención de equiparar la Ley

---

[11] A la luz de los debates en la Convención Constituyente, la frase "origen o condición social" se utiliza en referencia a factores económicos y sociales, y no para aludir al país de procedencia de una persona. R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. PR, 1988, Vol. II, pág. 1189. Véanse, además: Exposición de Motivos de la Ley Núm. 67 de 3 de junio de 1983 (1983 Leyes de Puerto Rico 150); Informe Conjunto de las Comisiones de Gobierno, de Trabajo y de lo Jurídico en relación con el P. del S. 929, 20 de abril de 1983, pág. 2.

Núm. 100, *supra*, con el Título VII de la Ley Federal de Derechos Civiles de 1964 (Título VII), según enmendada, 42 USC sec. 2000e-1 *et seq.*, la cual prohíbe de manera expresa el discrimen por origen nacional en el empleo.[12]

En estricta hermenéutica jurídica, el Art. 2.13 de la Ley Núm. 4, 29 LPRA sec. 122l, establece que "[t]oda ley o reglamento de Puerto Rico que regule las relaciones entre un patrono y un empleado que se refiera a un asunto similar a lo regulado por una ley aprobada por el Congreso de los Estados Unidos de América o un reglamento emitido al amparo de una ley federal, se interpretará de manera consistente con dichas normas federales, salvo que la ley de Puerto Rico expresamente requiera una interpretación distinta". Cónsono con lo anterior, el Art. 6.2 de la Reforma Laboral, 29 LPRA sec. 123a, dispone que "**[a]l aplicarse las disposiciones de cualquier ley de discrimen o represalia en el empleo, se reconocerá lo dispuesto en la legislación y reglamentación federal, al igual que las interpretaciones judiciales de las mismas de aquellos tribunales con jurisdicción en Puerto Rico, <u>a los fines de asegurar interpretaciones consistentes en cuanto a términos o disposiciones similares</u>**, salvo que las disposiciones de la legislación local requieran una interpretación distinta". (Negrilla y subrayado suplidos). De esta manera, estamos llamados a examinar el

---

[12] Véase Exposición de Motivos de la Ley Núm. 67 de 3 de junio de 1983, *supra*.

tratamiento de las acciones sobre discrimen por motivo de "origen nacional" en virtud de las disposiciones análogas del Título VII, *supra*, en el ámbito federal.

## 2. El discrimen por razón de origen nacional en la esfera federal

A nivel federal, el Título VII, 42 USC sec. 2000e-2(a)1, prohíbe expresamente el discrimen por raza, color, religión, sexo u **origen nacional** en el empleo.[13] Al interpretar este estatuto federal, el Tribunal Supremo de Estados Unidos aclaró que el término "origen nacional" se refiere al país donde una persona nace o del cual sus ancestros provienen ("[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came"). Espinoza v. Farah Mfg. Co., 414 US 86, 88 (1973). En el citado caso, la señora Espinoza, quien era ciudadana de México y residía legalmente con su esposo en el estado de Texas, alegó que su patrono la discriminó por su origen nacional al rechazar su solicitud de empleo por no tener la ciudadanía de Estados Unidos. No obstante, al interpretar el alcance de las protecciones al amparo del Título VII, *supra*, y tras

---

[13] La disposición específicamente expone lo siguiente:

"(a) It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Título VII de la Ley Federal de Derechos Civiles de 1964, según enmendada, 42 USC sec. 2000e-2(a)1.

revisar el historial legislativo, el Tribunal Supremo federal determinó que el término "origen nacional" no comprendía el concepto de "ciudadanía". <u>Espinoza v. Farah Mfg. Co.</u>, *supra*, págs. 90-91. Según expresó la Corte Suprema federal, concluir lo contrario hubiese sido irrazonable, dado que el propio Congreso ha impuesto el requisito de la ciudadanía estadounidense como condición para el empleo federal mediante otras leyes. <u>Íd.</u>, pág. 90.

Los conceptos de "ciudadanía", "estatus migratorio" y "raza" se encuentran íntimamente relacionados con el término "origen nacional", pero tienen significados distintos y pueden encontrar resguardo bajo estatutos diferentes.[14] Aunque los extranjeros están protegidos contra el discrimen basado en raza, color, religión, sexo u origen nacional bajo el Título VII, *supra*, **esta ley federal no prohíbe específicamente el discrimen por razón**

---

[14]  Sobre este particular, la tratadista Barbara Lindemann comenta lo siguiente:

"Closely related to national origin, but analytically distinct from it, are citizenship, immigration status, and, in some circumstances, race.  The distinctions between these several characteristics are not always clear.  'National origin' pertains to the geographic birthplace of the person (or his or her ancestors).  'Citizenship' refers to the country to which a person has a presumptive political allegiance.  In the United States, for example, a person establishes citizenship by birth or by immigration and naturalization.  'Immigration status' refers to whether a noncitizen is in the country legally or illegally as defined by the federal immigration policy.  'Race' generally is characterized by a person's skin pigmentation, although it may include affinity groups defined by other ethnic characteristics.  Sometimes the distinctions among national origin, citizenship, immigration status, and race are difficult to identify.  Understanding the distinctions is essential, however, because particular statutes may cover discrimination based on some, but not all, such characteristics." B.T. Lindemann y otros, *Employment discrimination law*, 5ta ed. rev., Arlington, Ed. Bloomberg BNA, 2012, Vol. I, pág. 7-2.

de "ciudadanía", "extranjería" o "estatus migratorio".
Espinoza v. Farah Mfg. Co., *supra*, pág. 95. Véase, además,
Cortezano v. Salin Bank & Tr. Co., 680 F.3d 936, 940 (7mo
Cir. 2012). Ciertamente, el Tribunal Supremo de
Estados Unidos reconoció que ciertas exigencias en el
empleo, como por ejemplo la ciudadanía, podrían formar
parte de un esquema más amplio de discrimen por razón de
origen nacional.[15] Sin embargo, tras el análisis de rigor,
**el Alto Foro federal resolvió que allí no se logró
demostrar el propósito o efecto discriminatorio por motivo
de origen nacional**. Espinoza v. Farah Mfg. Co., *supra*,
pág. 92.

Por otro lado, con la aprobación ulterior de la Ley de
Reforma y Control de Inmigración de 1986 (IRCA, por sus
siglas en inglés), el Congreso de Estados Unidos enmendó
la Ley de Inmigración y Nacionalidad (INA, por sus siglas
en inglés) e implementó un sistema de sanciones severas
para aquellos patronos que emplearan a extranjeros sin
autorización para trabajar en Estados Unidos.[16] Véase
8 USC sec. 1324a. De esta forma, todo patrono tiene la

---

[15]  Véase Espinoza v. Farah Mfg. Co., 414 US 86, 92 (1973) ("[i]n some instances, for example, a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination. In other cases, an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination. Certainly Tit. VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin").

[16]  En Puerto Rico, la Ley Núm. 48 de 29 de mayo de 1973 prohíbe a los patronos emplear extranjeros a sabiendas de que residen ilegalmente en el país y tipifica tal conducta como delito menos grave e impone penalidades económicas por violaciones a sus disposiciones. 29 LPRA secs. 153 y 154.

obligación de verificar que sus empleados están autorizados para trabajar legalmente en Estados Unidos mediante el examen de documentos aceptables y el cumplimiento del "Formulario I-9". Véanse: 8 USC sec. 1324a(b); 8 CFR sec. 274a.2(a)(2). Muchos consideraron que, a raíz de esta estricta política migratoria, los patronos evitarían contratar a cualquier persona que pareciera "extranjera".[17] En respuesta, el Congreso de Estados Unidos creó una causa de acción independiente bajo IRCA contra el discrimen y prácticas documentales desleales por razón de origen nacional, ciudadanía o estatus migratorio. Véase 8 USC sec. 1324b. Debe notarse que el referido estatuto federal tiene un alcance distinto al del Título VII, *supra*,[18] y sus disposiciones antidiscriminatorias, por consiguiente, no son análogas a las de la Ley Núm. 100, *supra*.

En esencia, la prohibición que establece el Título VII, *supra*, contra el discrimen por origen nacional no tan sólo incluye el discrimen por razón del lugar de procedencia de la persona o de sus ancestros, "sino también todo tipo de discrimen relacionado con características estereotipadas que corresponden a las personas de ciertos lugares o

---

[17]   Véase Sec. 7:9. Antidiscrimination, 1 Guide to Employment Law and Regulation Sec. 7:9.

[18]   Véase B.T. Lindemann y otros, *op. cit.*, pág. 7-27 ("[c]laims under IRCA are 'immigration-related unfair employment practices.' These claims are received and processed by a 'Special Counsel' in the U.S. Department of Justice. The Special Counsel and the EEOC cannot simultaneously entertain a charge based on the same set of facts"). Véase, además, Sec. 1:15. Topics of employment discrimination—Alienage and citizenship, 1 Termination of Employment Sec. 1:15 ("the IRCA's nondiscrimination provisions do not extend to national origin discrimination that is prohibited by Title VII").

nacionalidades".[19]   Ciertos escenarios como los de un patrono que se niega a contratar a personas que hablan con un acento foráneo o por tener un nombre asociado a un origen nacional particular son sólo algunos ejemplos de este tipo de discrimen.[20]  A modo ilustrativo, las guías de la Comisión de Igualdad de Oportunidades en el Empleo (EEOC, por sus siglas en inglés) consideran que excluir a un individuo de oportunidades de empleo por tener las características físicas, culturales o lingüísticas de un grupo de determinado origen nacional ejemplifica esta modalidad de discrimen.  Véase 29 CFR sec. 1606.1.

**3. El esquema probatorio en las reclamaciones por discrimen en el empleo**

Antes de la aprobación de la Reforma Laboral, el Art. 3 de la Ley Núm. 100, 29 LPRA sec. 148 (ed. 2009), establecía una presunción controvertible de discrimen a favor del empleado mediante la cual se infería que los actos discriminatorios mencionados en la ley eran cometidos si eran realizados sin justa causa.[21]  Segarra Rivera v. Int'l. Shipping *et al.*, *supra*, pág. 988.  Véanse, además: Díaz v. Wyndham Hotel Corp., 155 DPR 364, 383 (2001);

---

[19]   A. Acevedo Colom, *Legislación protectora del trabajo comentada*, 8va ed. rev., San Juan, Ed. Ramallo Printing Bros., 2005, pág. 238.

[20]   Íd.

[21]   En específico, antes de la aprobación de la Ley Núm. 4-2017, conocida como Ley de Transformación y Flexibilidad Laboral, el Art. 3 de la Ley Núm. 100, 29 LPRA sec. 148 (ed. 2009), disponía lo siguiente:

"Se presumirá que cualquiera de los actos mencionados en las secciones precedentes fueron cometidos en violación de las secs. 146 a 151 de este título, cuando los mismos hayan sido realizado sin justa causa. Esta presunción será de carácter controvertible".

S.L.G. Hernández-Beltrán v. TOLIC, 151 DPR 754, 774 (2000);

Soto v. Hotel Caribe Hilton, *supra*, págs. 302-303; Ibáñez

v. Molinos de P.R., Inc., 114 DPR 42, 50 (1983).   No

obstante, en virtud del Art. 6.3 de la Reforma Laboral, la

Asamblea Legislativa eliminó el primer párrafo que

establecía tal presunción al aprobar el Art. 3 de la Ley

Núm. 100, 29 LPRA sec. 148 (ed. 2017).[22] Esta modificación,

en conjunto con las reglas de hermenéutica discutidas,

equiparó la forma en que se prueban los casos de discrimen

al amparo de la Ley Núm. 100, *supra*, con el esquema

probatorio existente bajo el Título VII, *supra*.[23]

La presunción que fue eliminada tenía el efecto

principal de transferir a la parte demandada, entiéndase,

al patrono, el peso de presentar prueba y de persuadir al

tribunal.   Ibáñez v. Molinos de P.R., Inc., *supra*,

págs. 51-52.   En contraste, **cuando se establece un caso**

***prima facie* de discrimen en el ámbito federal, sólo se**

**transfiere al patrono el peso de <u>presentar</u> prueba, ya que**

**el peso de <u>persuadir</u> al tribunal recae siempre sobre la**

**parte demandante, es decir, sobre el empleado.** St. Mary's

Honor Ctr. v. Hicks, 509 US 502, 511 (1993); Texas Dept.

---

[22]   Aunque el Art. 3 de la Ley Núm. 100, 29 LPRA sec. 148 (ed. 2017), aplicable a este caso, fue enmendado posteriormente por la Ley Núm. 41-2022 para restablecer la presunción, dicha ley fue declarada *nula ab initio* por el Tribunal de Distrito Federal, decisión que fue confirmada por el Tribunal de Apelaciones para el Primer Circuito de Estados Unidos.   Véase *In re* Fin. Oversight & Mgmt. Bd. for Puerto Rico, 77 F.4th 49 (1er Cir. 2023), cert. denegado, 144 S. Ct. 1097, 218 L. Ed. 2d 341 (2024).

[23]   E. García García, *El legado e implicaciones de la reforma laboral de 2017*, 86 Rev. Jur. UPR 1087, 1161 (2017).

of Community Affairs v. Burdine, 450 US 248, 253 (1981).
Véanse, además: Ibáñez v. Molinos de P.R., Inc., *supra*;
Díaz v. Wyndham Hotel Corp., *supra*, pág. 382 esc. 32.
Aclarada esta distinción, nos corresponde examinar el
esquema probatorio vigente en la jurisdicción federal como
marco de referencia para disponer de una acción de
discrimen por razón de origen nacional en nuestro
ordenamiento jurídico.

En McDonnell Douglas Corp. v. Green, 411 US 792 (1973)
(en adelante, *McDonnell Douglas*), el Tribunal Supremo de
Estados Unidos formuló por primera vez un esquema
probatorio para los casos de discrimen bajo el Título VII,
*supra*. Hemos señalado que este esquema se utiliza para
dilucidar (mediante prueba circunstancial y el beneficio
de presunciones e inferencias) si hubo intención o ánimo
discriminatorio en la mente de quien tomó la decisión
adversa en el empleo. Díaz v. Wyndham Hotel Corp., *supra*,
pág. 382 esc. 32. Del mismo modo, hemos expresado que
"[a]nte la presencia de prueba directa de discrimen, el
caso *prima facie* es inaplicable". Íd., págs. 382-383
esc. 32.

Bajo este modelo de distribución de turnos y cargas
probatorias, el Máximo Foro federal determinó que
inicialmente la parte demandante tiene el peso de demostrar
—mediante preponderancia de la prueba— un caso *prima facie*
de discrimen. Texas Dept. of Community Affairs v. Burdine,
*supra*, págs. 252-253; McDonnell Douglas Corp. v. Green,

*supra*, pág. 802. Si bien los elementos enunciados en *McDonnell Douglas* para establecer un caso *prima facie* surgieron en el contexto de un patrono que se negó a volver a contratar a un exempleado por razón de un discrimen racial,[24] el Máximo Foro federal ha reconocido la flexibilidad de este estándar probatorio de acuerdo con las circunstancias particulares de cada caso.[25] Swierkiewicz v. Sorema N.A., 534 US 506, 512 (2002); McDonnell Douglas Corp. v. Green, *supra*, pág. 802 esc. 13. En esa línea, el peso de establecer un caso *prima facie* de discrimen no es oneroso. Texas Dept. of Community Affairs v. Burdine, *supra*, pág. 253.

En lo que respecta a la presente controversia, los criterios para demostrar un caso *prima facie* de discrimen en un despido son los siguientes: (1) que el empleado es miembro de un grupo protegido; (2) que el empleado estaba cualificado para el trabajo; (3) que el empleado fue

---

[24] El Tribunal Supremo de Estados Unidos formuló los requisitos siguientes:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." McDonnell Douglas Corp. v. Green, 411 US 792, 802 (1973).

[25] Véase C.A. Sullivan y L.M. Walter, *Employment Discrimination Law and Practice*, 4ta ed., Ed. Aspen Publishers, 2009, Vol I, pág. 106 ("the lower courts have followed this authorization and formulated a number of alternative *prima facie* cases for other situations, all of which are usually referred to under the *McDonnell Douglas* rubric even though the precise specifications have not been approved by the Court").

despedido, y (4) que el patrono buscó reemplazar al empleado por otra persona con cualificaciones similares. Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1er Cir. 2000); Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 673 (1er Cir. 1996); Lipsett v. University of Puerto Rico, 864 F.2d 881, 899 (1er Cir. 1988).

Luego de que la parte demandante logra establecer un caso *prima facie*, se activa una presunción de discrimen a favor del empleado y se transfiere al patrono únicamente el peso de producir o presentar evidencia admisible ante el tribunal (no el de persuadirlo) sobre una razón legítima, no discriminatoria, para la acción adversa. St. Mary's Honor Ctr. v. Hicks, *supra*, págs. 506-507; Texas Dept. of Community Affairs v. Burdine, *supra*, pág. 254; McDonnell Douglas Corp. v. Green, *supra*, pág. 802. Conviene destacar que, para rebatir la presunción de discrimen en esta etapa, no se requiere que el patrono convenza al juzgador de que la razón proferida constituye la verdadera causa o, en estricto derecho, una justa causa para el despido, sino que meramente la evidencia debe ser lo suficientemente clara y específica para sostener que el motivo determinante no fue discriminatorio. Texas Dept. of Community Affairs v. Burdine, *supra*, págs. 254-255. Véase, además, Ibáñez v. Molinos de P.R., Inc., *supra*, pág. 49. Además, al evaluar si el patrono ha cumplido con su carga de articular una razón legítima y no

discriminatoria, **los tribunales se han <u>abstenido</u> de determinar que una decisión basada en una característica protegida bajo un estatuto distinto también constituye una razón impropia o discriminatoria bajo el estatuto aplicable**. <u>Hazen Paper Co. v. Biggins</u>, 507 US 604, 612 (1993). Véase, además, <u>Dionne v. Shalala</u>, 209 F.3d 705, 710 esc. 8 (8vo Cir. 2000) ("the Secretary's use here of the wrong standards was improper under the qualification standards promulgated by the agency in accordance with the Indian Preference Act, but not under Title VII").

Finalmente, cuando el patrono ofrece su explicación, la presunción de discrimen desaparece y el demandante tiene la oportunidad de demostrar mediante preponderancia de la prueba que la razón legítima ofrecida es un pretexto para ocultar el discrimen intencional. <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 US 133, 143 (2000); <u>Texas Dept. of Community Affairs v. Burdine</u>, *supra*, pág. 253; <u>McDonnell Douglas Corp. v. Green</u>, *supra*, pág. 804. En circunstancias apropiadas, la combinación de un caso *prima facie* y la demostración de que la justificación del patrono es falsa podría permitir una inferencia del discrimen intencional. <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, *supra*, págs. 147-148; <u>St. Mary's Honor Ctr. v. Hicks</u>, *supra*, pág. 511. Sin embargo, el que un demandante logre minar la explicación ofrecida por el patrono no siempre será suficiente para satisfacer el peso de <u>persuadir</u> al tribunal, pues existen instancias en las cuales no podrá

concluirse razonablemente la existencia del discrimen alegado. Reeves v. Sanderson Plumbing Prod., Inc., *supra*, pág. 148.

Hemos manifestado que el pretexto también se puede demostrar, entre otras maneras, "mediante evidencia circunstancial o estadística de otros individuos en la misma situación del demandante que, o bien se les ha discriminado por la misma razón, o bien han sido retenidos precisamente porque no pertenecen al mismo grupo minoritario". Soto v. Hotel Caribe Hilton, *supra*, pág. 305 (citando a Ibáñez v. Molinos de P.R., Inc., *supra*, pág. 49). De esta manera, "[e]l demandante puede probar [el] pretexto de dos (2) formas: directamente, persuadiendo al juzgador de los hechos de que lo más probable hubo motivo discriminatorio, o indirectamente, demostrando que la explicación ofrecida por el patrono no es creíble". Soto v. Hotel Caribe Hilton, *supra*, pág. 305 esc. 11. En cada caso particular, la procedencia del dictamen como cuestión de derecho dependerá de varios factores, incluyendo: (1) la solidez del caso *prima facie* del demandante; (2) el valor probatorio de la evidencia sobre la falsedad de la explicación del patrono, y **(3) cualquier otra evidencia que apoye el caso del patrono y que pueda considerarse adecuadamente.** Reeves v. Sanderson Plumbing Prod., Inc., *supra*, págs. 148-149.

**Un criterio importante que los tribunales pueden considerar al momento de evaluar la evidencia sobre el**

**pretexto es la llamada inferencia del mismo actor ("same actor inference").[26]** Esta doctrina presupone que existe una fuerte inferencia de que el discrimen no fue el factor determinante de la acción adversa en aquellos casos en los que la misma persona que contrató al empleado fue quien lo despidió dentro de un periodo relativamente corto. Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 46 (1er Cir. 2019); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 847 (1er Cir. 1993). **Lo anterior se basa en el supuesto de que sería poco probable que, por ejemplo, un patrono que decida contratar a una persona a sabiendas de que es afroamericana discrimine luego en su contra despidiéndola por razón de esa misma característica protegida.[27]** Este enfoque ha sido bien establecido en los casos de discrimen por razón de edad, aunque algunos tribunales han extendido su aplicación en otros contextos,[28] **incluyendo en casos de discrimen por razón de origen nacional.** Véase Coghlan v. Am. Seafoods Co. LLC., 413 F.3d 1090, 1096-1098 (9no Cir. 2005).

Esbozada la normativa aplicable, pasamos a resolver el asunto presentado ante nosotros.

---

[26]   B.T. Lindemann y otros, *op. cit.*, pág. 2-99.

[27]   Íd.

[28]   Íd.

### III

### A

Por un lado, Sky Caterers propone que examinemos si el término "origen nacional" comprende el concepto de "estatus migratorio". La parte peticionaria plantea en su Alegato que desde un principio conocía que el señor Jiménez Soto era de nacionalidad dominicana. En ese sentido, señala que "[s]u nacionalidad no fue impedimento para que fuera contratado como empleado bajo periodo probatorio, con miras a que continuara en su plaza una vez transcurriera dicho término".[29] De igual forma, admite que se le apercibió al señor Jiménez Soto que su tarjeta de residencia permanente estaba a punto de expirar y que debía gestionar su renovación, ya que ésta presuntamente era indispensable para que pudiera permanecer en su empleo.

Sky Caterers argumenta que aun cuando el requerimiento de la renovación de la tarjeta de residencia permanente como condición para retener el empleo no fuese una justa causa para el despido, dicha exigencia no constituye una actuación discriminatoria a la luz de la totalidad de las circunstancias. Aduce que la parte recurrida no logró establecer un caso *prima facie* de discrimen debido a que no demostró el cuarto elemento del estándar probatorio, **es decir, que fue reemplazado por otra persona**. Por último, la parte peticionaria expone que el Tribunal de Apelaciones

---

[29] *Alegato de la parte peticionaria*, pág. 17.

erró al confirmar la determinación del Tribunal de Primera Instancia debido a la insuficiencia de prueba para demostrar que las razones ofrecidas fueron un pretexto para ocultar el alegado discrimen.

Por su parte, el señor Jiménez Soto afirma en su Alegato en oposición que la prueba del discrimen por razón de origen nacional es directa y que el esquema probatorio para establecer un caso *prima facie* de discrimen no aplica. Igualmente, plantea que Sky Caterers no logró probar que lo hubiera despedido independientemente de su origen nacional o estatus de ciudadanía, ya que la propia parte peticionaria ha afirmado consistentemente que el despido respondió a la expiración de su tarjeta de residencia permanente. En la alternativa, la parte recurrida señala que los foros *a quo* determinaron que hubo discrimen al aplicar el esquema probatorio establecido a nivel federal, por lo cual afirma que el resultado sería el mismo. Veamos.

**B**

En este caso, nos corresponde determinar si el Tribunal de Apelaciones erró al confirmar una *Sentencia parcial* mediante la cual el Tribunal de Primera Instancia resolvió sumariamente que Sky Caterers discriminó contra el señor Jiménez Soto por razón de su **origen nacional**. Surge de los documentos sometidos ante este Tribunal que no hay conflicto sobre los hechos materiales del pleito. De este modo, sólo nos resta aplicar el derecho a la presente controversia.

De entrada, es menester aclarar que en este caso no se ha presentado prueba directa sobre el alegado discrimen por razón de origen nacional. Como sabemos, la prueba directa es aquella que, de ser cierta y sin que medie inferencia o presunción alguna, demuestra el hecho en controversia de modo concluyente.[30] La presunta prueba directa a la cual el Tribunal de Primera Instancia hizo referencia consiste en la razón expuesta por Sky Cateerers en la carta de despido intitulada "Personnel Action Notification Report", la cual disponía lo siguiente: "Terminación en periodo probatorio efectivo el 7/18/2018, por no estar autorizado a trabajar en los Estados Unidos y sus territorios".[31]

No podemos derivar concluyentemente de esta prueba un discrimen por razón de **origen nacional**. En la carta no se hizo mención alguna sobre el país de procedencia del señor Jiménez Soto o de sus ancestros como motivo de su despido. Tampoco se aludió a las características físicas, culturales o lingüísticas concernientes al origen nacional de éste. Del referido documento se puede inferir, cuando menos, que la parte peticionaria fundamentó su decisión en lo que podría catalogarse como un asunto de estatus migratorio. En consecuencia, ante la ausencia de prueba directa sobre

---

[30] Véase Regla 110(h) de Evidencia, 32 LPRA Ap. VI.

[31] Determinación de hecho núm. 50 de la *Sentencia parcial del Tribunal de Primera Instancia*, Apéndice del *certiorari*, pág. 26. Véase, además, *Personnel Action Notification Report*, Apéndice del *certiorari*, pág. 321.

el discrimen alegado, procedemos a analizar este reclamo según el paradigma desarrollado en *McDonnell Douglas* y su progenie.

En esencia, bajo el esquema probatorio establecido en *McDonnell Douglas*, el señor Jiménez Soto tenía el peso inicial de establecer un caso *prima facie* de discrimen. Para ello, éste debía demostrar: (1) que era miembro de un grupo protegido; (2) que estaba cualificado para el trabajo; (3) que fue despedido, y (4) que el patrono buscó reemplazarlo por otra persona con cualificaciones similares. En vista de que, a la postre, determinamos que la parte recurrida no logró satisfacer el *quantum* de prueba necesario para persuadirnos de que hubo un discrimen intencional por razón de origen nacional, asumiremos para propósitos de argumentación solamente, sin decidir la cuestión, que el señor Jiménez Soto logró establecer un caso *prima facie* de discrimen. Después de todo, la carga de establecer un caso *prima facie* de discrimen no es onerosa y debemos examinar el expediente de la manera más favorable hacia la parte que se opuso a la moción de sentencia sumaria.

Como ya indicamos, una vez se establece un caso *prima facie*, se activa una presunción de que el patrono incurrió en discrimen contra el empleado. Para rebatir la mencionada inferencia, Sky Caterers debía presentar prueba admisible sobre una razón legítima, no discriminatoria, para la acción adversa. La parte peticionaria articuló

ante el Tribunal de Primera Instancia dos (2) razones para el despido: (1) que el señor Jiménez Soto no estaba autorizado a trabajar en Estados Unidos debido a que su tarjeta de residencia permanente se encontraba vencida, y (2) que el señor Jiménez Soto no pudo tramitar una identificación para obtener acceso al aeropuerto. Sin embargo, el foro de primera instancia concluyó que no había posibilidad de que Sky Caterers pudiera rebatir la presunción de discrimen, mientras que el Tribunal de Apelaciones confirmó la decisión basándose en que la primera razón expuesta por la parte peticionaria era contraria en derecho al amparo de IRCA y la segunda razón no le mereció credibilidad.

Como hemos mencionado, una decisión adversa de empleo basada en una característica protegida bajo otro estatuto no constituye automáticamente una razón ilegítima o discriminatoria bajo la ley aplicable. En ese sentido, la decisión de despedir a un empleado por el hecho de que su tarjeta de residencia se encontraba expirada pudo haber sido impropia bajo las disposiciones antidiscriminatorias de IRCA, pero no constituye una actuación ilegal o discriminatoria por razón de origen nacional bajo el Art. 1 de la Ley Núm. 100, *supra*. Esto no quiere decir que la parte peticionaria podía despedir legalmente a la parte recurrida por tal motivo, sino que esta última debió tramitar su reclamación a través del procedimiento administrativo correspondiente para valerse de IRCA. Tanto

el Tribunal de Apelaciones como el Tribunal de Primera Instancia erraron al utilizar indistintamente los conceptos de ciudadanía, estatus migratorio y origen nacional según expuestos en otras disposiciones estatutarias federales que no son análogas a las existentes al amparo de la Ley Núm. 100, *supra*, y el Título VII, *supra*. **En conformidad con el derecho reseñado, resolvemos que el término "origen nacional" bajo la Ley Núm. 100, *supra*, al igual que en su homóloga federal, no contempla el discrimen por razón de "ciudadanía" o "estatus migratorio".**

Además, resaltamos que en esta fase del esquema probatorio no se requería que la parte peticionaria convenciera al juzgador sobre la veracidad de las razones expuestas para el despido. Según señalamos, el patrono sólo tenía el peso de producir prueba suficiente que, de ser creída, permitiera concluir que la acción adversa respondió a una razón no discriminatoria bajo la Ley Núm. 100, *supra*. Véanse: <u>Mary's Honor Ctr. v. Hicks</u>, *supra*, pág. 507; <u>Texas Dept. of Community Affairs v. Burdine</u>, *supra*, págs. 254-255. **Por lo tanto, determinamos que la parte peticionaria sí logró rebatir la referida presunción tras cumplir con su carga de <u>producción</u>.**

Superado lo anterior, pasamos a la tercera y última etapa, en la cual la presunción de discrimen desaparece y el empleado tiene la oportunidad final de demostrar que las razones ofrecidas constituían un pretexto para el

discrimen alegado. Es importante recordar que el empleado retiene en todo momento la carga de <u>persuadir</u> al tribunal, por preponderancia de la prueba, de que fue discriminado. En consecuencia, el señor Jiménez Soto tenía el peso de demostrar que las dos (2) razones ofrecidas por Sky Caterers eran un pretexto para el alegado discrimen por razón de su **<u>origen nacional</u>**.

Según indicamos, la primera explicación de la parte peticionaria para el despido se basó en que el recurrido carecía de autorización para trabajar en Estados Unidos porque su tarjeta de residencia se encontraba expirada. El señor Jiménez Soto refutó dicha aseveración y probó que la caducidad de su tarjeta de residencia legal permanente no conllevaba la expiración de su autorización para trabajar. Ahora bien, a pesar de que el recurrido logró demostrar que la razón expuesta por Sky Caterers era irreal, sus planteamientos giraron en torno a una violación de las disposiciones antidiscriminatorias por razón de "ciudadanía" o "estatus migratorio" al amparo de IRCA, mas no en virtud de la Ley Núm. 100, *supra*, por razón de "origen nacional".

En cuanto a la segunda razón ofrecida para el despido, el recurrido probó que no realizaba sus funciones en el aeropuerto, sino en otro edificio, por lo cual su entrada al aeropuerto era innecesaria para poder trabajar.[32] De

---

[32] Determinaciones de hechos núms. 27 y 32 de la *Sentencia parcial del Tribunal de Primera Instancia*, Apéndice del *certiorari*, pág. 24.

igual manera, quedó demostrado que Aerostar le había concedido al señor Jiménez Soto hasta el 9 de agosto de 2018 para que atendiera su asunto migratorio y obtuviera su identificación aeroportuaria.[33] De esta forma, el señor Jiménez Soto demostró que la segunda razón ofrecida por la parte peticionaria para la acción adversa no encuentra sustento en los hechos que surgen del expediente.

Es cierto que en esta etapa un empleado puede intentar probar que ha sido víctima de discrimen intencional al demostrar que las explicaciones ofrecidas por el patrono para la acción adversa son falsas. No obstante, como ya adelantamos, esto no siempre es suficiente para probar el discrimen. La prueba de que la razón proferida por el patrono carece de credibilidad es simplemente una forma de evidencia circunstancial que pudiese ser suficientemente persuasiva al momento de probar el discrimen intencional. Reeves v. Sanderson Plumbing Prod., Inc., *supra*, pág. 147. Sin embargo, pueden haber otros factores probatorios que arrojen luz sobre la existencia o inexistencia del discrimen alegado.

En este caso, el señor Jiménez Soto no presentó evidencia circunstancial o estadística alguna para demostrar la existencia de un trato discriminatorio por parte de Sky Caterers hacia otros miembros del mismo grupo protegido. Tampoco presentó prueba de cualquier tipo de

---

[33] Determinaciones de hechos núms. 44 y 45 de la *Sentencia parcial del Tribunal de Primera Instancia*, Apéndice del *certiorari*, pág. 25.

trato favorable por parte de Sky Caterers hacia otros individuos en la misma situación por no pertenecer al grupo minoritario en cuestión. Por último, entre otros de los elementos que pueden ser considerados, se encuentra la aplicación de la doctrina de la inferencia del mismo actor, la cual evaluamos a continuación.

### C

Según surge de las determinaciones de hechos formuladas por el Tribunal de Primera Instancia y sostenidas por el Tribunal de Apelaciones, el señor Jiménez Soto le informó a Sky Caterers durante el proceso de reclutamiento que era de nacionalidad dominicana.[34] De todos modos, la parte peticionaria contrató posteriormente al recurrido para que comenzara a trabajar el 30 de junio de 2018.[35] No está en controversia que la Sra. Maritza Santiago fue la empleada de recursos humanos que lo reclutó.[36] El 17 de julio de 2018, la señora Yazaida Reyes, quien verificó favorablemente la elegibilidad de empleo del señor Jiménez Soto, le entregó al recurrido —bajo las instrucciones de la Sra. Maritza Santiago— la carta de despido, efectivo al

---

[34] Determinación de hecho núm. 12 de la *Sentencia parcial del Tribunal de Primera Instancia*, Apéndice del *certiorari*, pág. 22. Véase, además, *Declaración Jurada* de la Lcda. Glenda I. Solá Carrillo, Directora de Recursos Humanos, Apéndice del *certiorari*, pág. 135.

[35] Determinaciones de hechos núms. 23 y 24 de la *Sentencia parcial del Tribunal de Primera Instancia*, Apéndice del *certiorari*, pág. 24.

[36] Este hecho fue admitido por Carolina Catering Corp. h/n/c Sky Caterers y Management Group Investors, LLC (Sky Caterers o parte peticionaria) en el inciso once (11) de la *Contestación a la demanda*, Apéndice del *certiorari*, pág 89.

18 de julio de 2018, en la que Sky Caterers aludió como fundamento a su **estatus migratorio**.[37]

El Tribunal de Apelaciones descartó por completo el hecho de que Sky Caterers tenía conocimiento de la nacionalidad del señor Jiménez Soto al momento de contratarlo como prueba de la inexistencia del discrimen.[38] No obstante, éste era un hecho material que sin duda el foro apelativo intermedio debió considerar al evaluar la prueba sobre el pretexto para resolver la reclamación. Como indicamos, esta doctrina admite una fuerte inferencia de que el discrimen no fue el factor determinante de la acción adversa en el empleo cuando el mismo individuo que tenía conocimiento de la característica protegida al momento de contratar al empleado, luego lo despide dentro de un periodo relativamente corto. Véase, por ejemplo, Coghlan v. Am. Seafoods Co. LLC., *supra*.

De esta manera, resolvemos que en el presente caso aplica la doctrina de la inferencia del mismo actor. El hecho de que la parte peticionaria contratara al recurrido a sabiendas de su origen nacional es indicativo de la inexistencia del discrimen. El razonamiento de que Sky

---

[37]  Determinaciones de hechos núms. 50, 52 y 54 de la *Sentencia parcial del Tribunal de Primera Instancia*, Apéndice del *certiorari*, pág. 26. Véase, además, *Deposición del señor Jiménez Soto*, Apéndice del *certiorari*, pág. 409.

[38]  En específico, el Tribunal de Apelaciones manifestó que "[e]stos planteamientos, además de no impugnar los hechos determinados, ignoran que el hecho de que la tarjeta de residencia del apelado expirara no significaba que la autorización para trabajar en Estados Unidos y sus Territorios también había expirado". *Sentencia del Tribunal de Apelaciones*, Apéndice del *certiorari*, pág. 16.

Caterers pudiera haber desarrollado una aversión hacia el origen nacional del señor Jiménez Soto en tan sólo diecisiete (17) días desde su contratación es claramente un sinsentido. A la luz de los hechos probados y la totalidad de las circunstancias, no podemos concluir razonablemente que en este caso el recurrido logró demostrar el propósito o efecto discriminatorio en su contra por razón de origen nacional en el empleo. Consecuentemente, procede la desestimación sumaria de la acción de discrimen del señor Jiménez Soto y, por ende, la acción contingente de daños y perjuicios de su esposa y la sociedad de gananciales que componen entre ellos.

**IV**

Por las razones antes expresadas, revocamos la *Sentencia* emitida por el Tribunal de Apelaciones el 11 de octubre de 2023, así como la *Sentencia parcial* emitida por el Tribunal de Primera Instancia el 2 de mayo de 2023, y ordenamos la desestimación de la demanda presentada en contra de la parte peticionaria.

Se dictará *Sentencia* en conformidad.


ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Roberto Jiménez Soto y otros<br><br>Recurridos<br><br>v.<br><br>Carolina Catering Corp. h/n/c Sky Caterers; Management Group Investors, LLC<br><br>Peticionarios | CC-2023-733 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico, a 14 de enero de 2025.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente *Sentencia*, revocamos la *Sentencia* emitida por el Tribunal de Apelaciones el 11 de octubre de 2023, así como la *Sentencia parcial* emitida por el Tribunal de Primera Instancia el 2 de mayo de 2023. En consecuencia, ordenamos la desestimación de la demanda presentada en contra de la parte peticionaria.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión disidente. El Juez Asociado señor Estrella Martínez emitió una Opinión disidente. El Juez Asociado señor Colón Pérez emitió una Opinión disidente.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Roberto Jiménez Soto y otros

    Recurridos

        v.                  CC-2023-0733

Carolina Catering Corp. h/n/c
Sky Caterers; Management Group
Investors, LLC

    Peticionarios

La Jueza Presidenta ORONOZ RODRÍGUEZ emitió una Opinión Disidente

En San Juan, Puerto Rico, a 14 de enero de 2025.

Hoy una Mayoría de este Tribunal desestima la acción de discrimen laboral del Sr. Roberto Jiménez Soto so pretexto de que la Ley Núm. 100 de 30 de junio de 1959, según enmendada, también conocida como la *Ley Antidiscrimen de Puerto Rico*, 29 LPRA secs. 146-151 (Ley Núm. 100), no reconoce el discrimen por estatus migratorio y/o extranjería. Este curso de acción tiene el efecto práctico de avalar las acciones discriminatorias de Carolina Catering Corp. h/n/c Sky Caterers y Management Group Investors, LLC (en adelante, Sky Caterers) contra el señor Jiménez Soto, un residente legal permanente quien —a pesar de que poseía una tarjeta de residente permanente vencida—

estaba autorizado para trabajar en los Estados Unidos. Correspondía pautar que el discrimen por extranjería o estatus migratorio es una modalidad de discrimen por condición social que está prohibido tanto por nuestra Constitución como por la Ley Núm. 100. Por considerar que el proceder de la Mayoría es contrario a las garantías constitucionales contenidas en la Carta de Derechos de nuestra Constitución, así como al contenido y al alcance de la Ley Núm. 100, disiento respetuosamente.

## I.

El 25 de febrero de 2020 el señor Jiménez Soto, la Sra. Diana Morales y la Sociedad Legal de Bienes Gananciales compuesta por ambos (en conjunto, señor Jiménez Soto) presentaron una *Demanda* contra Sky Caterers. En esta indicó que Sky Caterers lo despidió el 18 de julio de 2018 porque no estaba autorizado para trabajar en los Estados Unidos y sus territorios, ya que su tarjeta de residente permanente había expirado. El señor Jiménez Soto argumentó que su despido constituyó una modalidad de discrimen por origen nacional y/o por su condición social al ser percibido y tratado como un inmigrante ilegal, en contravención al Art. 1 de la Ley Núm. 100, 29 LPRA sec. 146. En particular, el señor Jiménez Soto adujo que Sky Caterers no le brindó oportunidad de contactar a las agencias federales relevantes, ni le proveyó instrucciones sobre cómo proceder ante el vencimiento de su tarjeta de residente permanente. Además, indicó que las acciones de Sky Caterers eran contrarias a sus propias normas corporativas.

El 15 de julio de 2020 Sky Caterers presentó su *Contestación a la demanda*. En esta argumentó que el despido del señor Jiménez Soto no constituyó discrimen bajo el Art. 1 de la Ley Núm. 100, *supra*, ya que este no contaba con la tarjeta de acceso necesaria para entrar a su área de trabajo. Explicó que Aerostar Airport Holdings, LLC (Aerostar), entidad administradora del Aeropuerto Internacional Luis Muñoz Marín, requería que se presentara la tarjeta de residencia permanente renovada para proveer al señor Jiménez Soto una tarjeta de acceso a las inmediaciones. Asimismo, Sky Caterers sostuvo que el despido no fue con ánimo discriminatorio y que, luego de renovar su tarjeta de residencia permanente, el señor Jiménez Soto rechazó ser reinstalado en su puesto.

Tras varias incidencias procesales, el 10 de febrero de 2021 Sky Caterers presentó una *Moción de sentencia sumaria* el en la que expuso que el señor Jiménez Soto no logró demostrar un caso *prima facie* por discrimen. Además, reiteró que el despido de este era válido y señaló que él no tenía autorización para trabajar, pues su tarjeta de residencia permanente había expirado.

El 8 de marzo de 2021 el señor Jiménez Soto presentó su *Oposición a moción de sentencia sumaria y solicitud de sentencia sumaria a favor de la parte demandante*. En esta, afirmó que estaba autorizado a trabajar en los Estados Unidos, por lo que la razón de su despido fue improcedente y estaba directamente relacionada a su origen nacional y su estatus migratorio.

Así las cosas, el 2 de mayo de 2023 el Tribunal de Primera Instancia emitió una *Sentencia Parcial* mediante la cual confirmó que Sky Caterers discriminó en contra del señor Jiménez Soto por razón de su origen nacional. A grandes rasgos, el foro primario determinó que el despido era improcedente, pues las disposiciones federales aplicables establecen que la expiración de la tarjeta de residencia permanente no equivale a la revocación de autorización para trabajar en los Estados Unidos y sus territorios. Véase 8 CFR sec. 274a.12.[1]

Inconforme con el dictamen, el 10 de julio de 2023 Sky Caterers presentó un *Recurso de Apelación* ante el Tribunal de Apelaciones en el que reiteró que no se probó un caso *prima facie* de discrimen y que no hubo ánimo discriminatorio de su parte. Sin embargo, el 11 de octubre de 2023 el foro apelativo intermedio emitió una *Sentencia* mediante la cual confirmó el dictamen del Tribunal de Primera Instancia. Fundamentó su proceder en que el señor Jiménez Soto fue despedido a causa de que su tarjeta de residencia permanente expiró. En vista de esto, el foro intermedio expuso que la expiración de la tarjeta no equivalía a una revocación de su autorización para trabajar.

Aún en desacuerdo, el 10 de noviembre de 2023 Sky Caterers presentó un recurso de *certiorari* ante nos. Argumentó que el Tribunal de Apelaciones erró al dictaminar

---

[1] Tiene autorización para trabajar: "An alien who is a **lawful permanent resident** (with or without conditions pursuant to section 216 of the Act), as evidenced by Form I-551 issued by the Service. **An expiration date on the Form I-551 reflects only that the card must be renewed, not that the bearer's work authorization has expired**". (Negrillas suplidas). Íd.

que el señor Jiménez Soto estableció un caso *prima facie* de discrimen. Arguyó que, como Aerostar se negó a emitir la tarjeta de acceso no tuvo otra opción que despedir al señor Jiménez Soto. Ante ello, solicitó la revocación de los dictámenes recurridos.

El 24 de abril de 2024 el señor Jiménez Soto presentó su *Alegato en oposición a petición de certiorari* y rebatió el planteamiento de que Sky Caterers no actuó con la intención de discriminar en su contra. Indicó que el despido no se debió a la ausencia de la identificación que debía suministrar Aerostar sino porque el señor Jiménez Soto quedó desautorizado para trabajar en los Estados Unidos.

## II.

### A. La protección contra el discrimen en Puerto Rico

En nuestro país existe una legislación antidiscrimen que se aprobó en el 1959 y cuyo valor se ha sostenido tanto por este Tribunal como por la sociedad puertorriqueña. Sin embargo, ese estatuto tiene su génesis en los principios fundamentales de nuestra Constitución, que, a su vez, promueve y protege un respeto profundo por los derechos humanos.

De este modo, hemos reconocido que en Puerto Rico se formuló una Carta de Derechos de factura más ancha, con el propósito de recoger "el sentir común de culturas diversas sobre nuevas categorías de derechos". Garib Bazaín v. Hosp. Español Auxilio Mutuo de Puerto Rico, 204 DPR 601, 627 (2020) (opinión disidente de la Jueza Presidenta Oronoz Rodríguez) (citando a Pueblo v. Figueroa Navarro, 104 DPR 721, 725

(1976)). Es por esto que la Carta de Derechos de nuestra Constitución se encuentra entre las "más liberales, más generosas y más auténticamente democráticas del mundo". Pueblo v. Santiago Feliciano, 139 DPR 361, 436 (1995) (opinión disidente del Juez Asociado Rebollo López). Así, al interpretar esta enumeración de derechos, estamos obligados por disposición constitucional a realizar una interpretación liberal y expansiva, y evitar una actitud restrictiva y excluyente. Garib Bazaín v. Hosp. Español Auxilio Mutuo de Puerto Rico, *supra*, pág. 628.

En esta línea, el Art. II, Sec. 1 de nuestra Constitución consagra una política pública vigorosa dirigida a erradicar todo tipo discrimen. Santini Rivera v. Serv. Air, Inc., 137 DPR 1, 12 (1994). De manera específica, esta disposición establece lo siguiente:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, **origen o condición social**, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. (Negrillas suplidas). Art. II, Sec. 1, Const. ELA.

Sin embargo, esa enumeración no es taxativa, puesto que este Tribunal ha interpretado, aplicado y añadido categorías de discrimen en reconocimiento de que el Art. II, Sec. I de nuestra Constitución "no constituye una enumeración taxativa de las instancias que configuran el discrimen". Santini Rivera v. Serv. Air, Inc., *supra*, pág. 13 (citando a De Paz Lisk v. Aponte Roque, *supra*). Así, por ejemplo, en Wackenhut Corp. v. Rodríguez Aponte, 100 DPR 518 (1972), añadimos el discrimen por nacionalidad.

Para hacer valer esta política pública constitucional y para extender su protección al ámbito laboral puertorriqueño, la Asamblea Legislativa aprobó la Ley Núm. 100, de modo que se penalizara el discrimen. En su Exposición de Motivos, la Ley Núm. 100 establece que esta busca proveer una "eficaz protección a los trabajadores contra discrímenes por razón de raza, color, religión, sexo, origen o condición social de los empleados o aspirantes a empleo". 29 LPRA secs. 146-151. Es decir, el lenguaje del Art. II, Sec. 1 de nuestra Constitución se encuentra expresamente plasmado en la Ley Núm. 100 y permea su espíritu. Así, este estatuto pretende cumplir el objetivo antidiscriminatorio que origina en nuestra Carta de Derechos. Para así lograrlo, el Art. 1 de la Ley Núm. 100 responsabiliza a todo patrono que:

> [D]espida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo" a un empleado por razón de edad; raza; color; sexo; orientación sexual; identidad de género; origen social o nacional; **condición social**; afiliación política; ideas políticas o religiosas; por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho; o por ser militar, ex-militar, o por ostentar la condición de veterano. (Negrillas suplidas). 29 LPRA sec. 146.

A través de los años, la Asamblea Legislativa ha enmendado esta disposición para incluir otras categorías que también ostentan protección: (1) en el 1972 añadió la categoría de sexo para prohibir el discrimen en contra de las mujeres que se sumaban a la creciente fuerza laboral; (2) en el 1983 sumó la categoría de origen nacional o social; (3) en el 1997 suprimió la palabra religión y la sustituyó por la categoría de afiliación política, ideas políticas o religiosas, y (4) en el 2006 añadió la categoría de ser

víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho. 29 LPRA sec. 146.

### B. El origen o la condición social

Con la identificación de las categorías protegidas en el Art. II, Sec. 1, nuestra Constitución busca fijar y robustecer la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. Santini Rivera v. Serv. Air, Inc., *supra* (citando a 4 Diario de Sesiones de la Convención Constituyente 2561 (1951)). Una de esas clasificaciones protegidas es el origen o la condición social, la cual resulta un tanto enigmática pues no se encontraba en el texto original que la Comisión de la Carta de Derechos presentó ante la Convención Constituyente. Garib Bazaín v. Hosp. Español Auxilio Mutuo de Puerto Rico, *supra*, pág. 633.

El delegado Sr. Lino Padrón Rivera propuso una enmienda al Art. II a los efectos de incluir las palabras "o condición" después de origen, de modo que la disposición constitucional leyera "origen o condición social". Íd. La referida enmienda se aprobó sin mediar debate o comentarios entre los delegados. Íd. Sin embargo, posteriormente, el delegado Sr. Lionel Fernández Méndez solicitó una aclaración sobre la forma en que se haría valer el derecho a no ser discriminado por origen o condición social. Íd. Ante esta interrogante, el delegado Sr. Jaime Benítez Rexach señaló que:

> En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país, se subraya la inconstitucionalidad de todo favoritismo. Y **todo reconocimiento a distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento.** En lo que toca a qué es lo que se quiere decir con origen social, quiérese decir con origen social, que no importa **la extracción de la persona, su situación económica, su condición en la comunidad,** todos los puertorriqueños y todas las personas

sujetas a las leyes de Puerto Rico son iguales ante nuestras leyes si se aprueba esta disposición y cualquier intento de hacer discrimen en favor o en contra de una de ellas es ilegal. (Negrillas suplidas) 4 Diario de Sesiones de la Convención Constituyente 2576 (ed. 1961), pág. 1382.

Más allá de esta expresión breve, el Diario de Sesiones de la Convención Constituyente no contiene debates o comentarios sobre el significado del discrimen por condición social. Íd., pág. 634. No obstante, un examen del debate existente en la actualidad y la aplicación de los principios generales en cuanto a la interpretación liberal de los derechos individuales obliga a concluir que Art. II busca garantizar la dignidad y la igualdad de las personas. Íd.

En particular, la prohibición del discrimen por condición social protege a las personas de tratos diferenciales injustificados cuando estos están basados en su situación económica o en su condición en la comunidad. Íd. En vista de esto, el discrimen por condición social responde a factores sociales o económicos. Íd. Es más, se puede arribar a la conclusión de que la garantía contra el discrimen por condición social protege a las personas que son discriminadas por su estatus económico o por su estatus social, o ambas. Íd., pág. 635; J.R. Roqué Velázquez, *Apuntes hacia una definición del discrimen por "origen o condición social" en Puerto Rico*, 26 (Núm. 3) Rev. Jur. UIPR 519, 527 (1992) ("Existen dos vertientes del discrimen por 'origen o condición social', la primera, en que no se puede discriminar por origen o procedencia social o económica del individuo, y la segunda por condición o estatus social o económica del individuo").

En este contexto, "estatus social" se refiere a una situación especial en la que se encuentra una persona o un grupo en relación con las demás personas que componen la sociedad. Íd. Un ejemplo de ello es la ciudadanía o la extranjería. Recordemos que la ciudadanía, o la falta de ella, condiciona y define "importantes derechos y obligaciones en nuestra sociedad", De Paz Lisk v. Aponte Roque, 124 DPR 472, 487 (1989), de modo que se entiende que la ciudadanía o, en ausencia de ella, la extranjería, están directamente atadas al estatus migratorio de una persona y al ejercicio de sus derechos políticos. Íd.

Por otro lado, la Ley Núm. 67 de 3 de junio de 1983 enmendó la Ley Núm. 100 para incluir el discrimen por origen nacional como una modalidad separada de discrimen por condición social. En su Exposición de Motivos, la Asamblea Legislativa fundamentó este proceder en que el "término origen o condición social son utilizadas como sinónimos y no como áreas separadas [de derecho] con significados distintos". Esta enmienda se hizo a tono con lo estipulado en el Título VII de la Ley Federal de Derechos Civiles de 1964. Véase 42 USC sec. 2000e -2(a)1.

Al interpretar la disposición referente a discrimen por origen nacional, el Tribunal Supremo de los Estados Unidos explicó que esta se refiere al discrimen que una persona o sus ancestros enfrentan por razón del país en el que nacen. Espinoza v. Farah Mfg. Co., 414 US 86, 88 (1973). En términos explícitos, esta interpretación del Tribunal Supremo de los Estados Unidos tuvo el efecto de limitar el alcance del

término "origen nacional" y de diferenciarlo del discrimen por razones de ciudadanía o extranjería. Íd., pág. 90-94.

### C. La extranjería en la esfera federal

El Congreso de los Estados Unidos es el cuerpo gubernamental llamado a legislar sobre la política migratoria que reglamenta la admisión de los extranjeros a nuestra jurisdicción. De Paz Lisk v. Aponte Roque, *supra*, pág. 478. Esta capacidad emana de los poderes de índole constitucional relegados a esta institución legislativa sobre el comercio, la naturalización, la guerra, la inmigración y la importación. Íd. En tal capacidad, el Congreso decide quién puede entrar y permanecer en territorio estadounidense, así como el estatus legal de las personas admitidas. Íd.

Por su parte, el Tribunal Supremo de los Estados Unidos clasificó a las personas extranjeras como no ciudadanos cuya entrada a una jurisdicción determinada es autorizada, o no autorizada, por instituciones gubernamentales, por lo que la admisión autorizada los hace residentes legales de dicho territorio. Véase Rabang v. Boyd, 353 US 427 (1957); Graham v. Richardson, 403 US 365 (1971).

Empero, el Tribunal Supremo de los Estados Unidos ha rechazado el argumento de que toda legislación estatal que incide sobre la política migratoria queda desplazada por la cláusula de supremacía federal. De Paz Lisk v. Aponte Roque, *supra*, 478-479 (citando a De Canas v. Bica, 424 U.S. 351, 355-356 (1976)). A esos efectos, determinó que una ley estatal que regule asuntos de discrimen o trato injusto de inmigrantes en el ámbito laboral será permitida, siempre y cuando no

conflija con la ley federal. Véase <u>Chamber of Commerce of U.S. v. Whiting</u>, 563 US 582 (2011).[2]

### D. El modelo antisubyugación

Según discutí en mi Opinión disidente en el caso de <u>Garib Bazaín v. Hosp. Español Auxilio Mutuo de Puerto Rico</u>, *supra*, corresponde aplicar el modelo antisubyugación al análisis sobre discrimen por razón de condición social. Esto así ya que el referido modelo es enteramente compatible con nuestros pronunciamientos sobre las características de las clasificaciones sospechosas y el tipo de discrimen que está vedado por nuestra Constitución. Es de notar que este modelo establece parámetros que permiten identificar clases de discrímenes en el contexto del **discrimen por condición social**, ya que "se enfoca en identificar grupos o individuos a los que se les ha atribuido una connotación negativa en la sociedad y, a causa de ello, se les ha relegado a un estado de inferioridad". (Negrillas suplidas). <u>Íd.</u>, pág. 636. La

---

[2] La *Immigration Reform and Control Act of 1986* (IRCA, por sus siglas en inglés) solo desplaza aquella ley estatal que penalice a patronos que contratan o refieran a empleo a aquellas personas que no están autorizadas a trabajar. ("The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.") 8 USCA § 1324a(h)(2). Además, existen casos federales en los cuales se ha validado la procedencia de leyes estatales que regulan asuntos sobre el discrimen de trabajadores inmigrantes. Por ejemplo, el 9no Circuito determinó que la *Legal Arizona Workers Act* (LAWA, por sus siglas en inglés) no queda desplazada por la IRCA. <u>Arizona Contractors Ass'n, Inc. v. Candelaria</u>, 534 F. Supp. 2d 1036, 1054 (D. Ariz.) (2011). Ese foro recalcó que, aunque la LAWA carece de una estipulación que adopte explícitamente la disposición antidiscriminatoria de la IRCA, si prohíbe el discrimen mediante una disposición general que le concede deferencia a las legislaciones estatales y federales vigentes sobre discrimen en el ámbito laboral, lo cual incluye la IRCA. <u>Íd.</u> Ante ello, el 9no Circuito explicó que la disposición antidiscriminatoria de la LAWA es válida ya que "no existe un conflicto con el objetivo en la esfera federal de desalentar el discrimen". <u>Íd.</u>

teoría de antisubyugación fue originalmente creada por el Prof. Lawrence Tribe, quien propuso romper con los sistemas de subordinación creados y reforzados por nuestro sistema legal que clasifican a ciertas personas como ciudadanos de segunda clase. Véase J.R. Roqué Velázquez, *Apuntes hacia una definición del discrimen por "origen o condición social" en Puerto Rico*, 26 Rev. Jur. UIPR 519 (1992). El modelo fue luego interpretado por el Prof. José R. Roqué Velázquez (profesor Roqué Velázquez), quien propuso tres criterios para delimitar su aplicación. Íd., pág. 519.

El profesor Roqué Velázquez indica que, en primer lugar, los tribunales deben evaluar si "la sociedad en general le atribuye una clasificación o connotación negativa, ya sea por mitos, ignorancia o prejuicios, a los miembros de ese grupo, clase o individuos". Íd., pág. 537. En segundo lugar, el profesor sostiene se debe auscultar si "a ese grupo, clase o individuos, se le ha sometido históricamente a un grado convincente de opresión en la sociedad". Íd. Por último, corresponde que el grupo marginado presente prueba del perjuicio o agravio causado por la clasificación negativa y la opresión social. Íd.

A grandes rasgos, el estatus inferior o negativo al que están relegadas las personas inmigrantes se sostiene por situaciones de desigualdad *de iure* y *de facto* entre nacionales y extranjeros que "acarrea[n] discriminación, xenofobia, humillación y marginación". Aurea María Sotomayor, *Migración irregular, soberanía y derechos humanos: La Opinión*

*Consultiva OC-18/02 de la Corte Interamericana de Derechos Humanos*, 76 Rev. UPR 169, 173 (2007).

A pesar de que la participación y la contribución económica de los trabajadores inmigrantes en el contexto laboral en los Estados Unidos es significativa, estos viven en los márgenes de la sociedad. Anita Sinha, Rebecca Smith & Cynthia Mark, *Protecting the Labor and Employment Rights of Immigrant Workers*, 38 Clearinghouse Review, 329 (2004). Las personas inmigrantes trabajan por cantidades de tiempo más largas y en los empleos más peligrosos y menos renumerados en los Estados Unidos. Íd., pág. 329-330. Esta situación precaria los hace más vulnerables al abuso y al acoso en el ámbito laboral. Íd.

Además, hace más de un siglo el Tribunal Supremo de los Estados Unidos determinó que las personas extranjeras son consideradas 'personas' para efectos del debido proceso de ley consagrado en la Decimocuarta Enmienda de la Constitución de los Estados Unidos y que, como tal, son acreedoras de la igual protección de las leyes. De Paz Lisk v. Aponte Roque, *supra*, págs. 498-499 (citando a Yick Wo v. Hopkins, 118 US 356 (1886)). Íd. Así, el Tribunal Supremo de los Estados Unidos reconoció la extranjería como una clasificación sospechosa. Graham v. Richardson, *supra*, pág. 372.

En su Opinión concurrente en Toll v. Moreno, 458 US 1, 20 (1982), el Juez Harry Blackmun reconoció que la casuística del Tribunal Supremo de los Estados Unidos evidencia el discrimen irracional al que se enfrentan las personas extranjeras. En su ponencia, el togado recalcó que "el trato

desigual a una clase de personas 'similarmente situadas' que históricamente han sido inhabilitadas por el prejuicio de una mayoría" ha obligado al Tribunal Supremo de los Estados Unidos a reconocer a los extranjeros como un grupo minoritario "separad[o] y aislad[o]" que merece extrema deferencia judicial ya que la extranjería es una categoría inherentemente sospechosa. Íd., págs. 20-21; Graham v. Richardson, *supra*, 372 (1971). El Juez Blackmun enfatizó en su Opinión concurrente la importancia de reconocer la impotencia de los extranjeros al estar socialmente situados en una posición inferior a los ciudadanos, "puesto que, combinado con el prejuicio, es la incapacidad de un grupo minoritario de hacer valer sus intereses políticos la que 'mina en funcionamiento de los procesos políticos que de ordinario sirven para proteger a las minorías'". Toll v. Moreno, *supra*, pág. 23.

**III.**

En el presente caso, Sky Caterers arguye que el Tribunal de Apelaciones erró al determinar que el señor Jiménez Soto estableció un caso *prima facie* de discrimen. Por su parte, el señor Jiménez Soto compareció en oposición y rebatió el argumento de Sky Caterers a los efectos de que este no actuó con la intención de discriminar en su contra. Contando con la comparecencia de ambos, una Mayoría de este Tribunal desestimó el caso en su totalidad, por entender que no se configuró una causa de acción de discrimen por origen nacional.

Sin embargo, en este no existe controversia alguna sobre

el hecho de que Sky Caterers despidió al señor Jiménez Soto porque su tarjeta de residencia permanente había expirado. Resulta evidente que, al así proceder, Sky Caterers discriminó contra el señor Jiménez Soto a causa de su estatus migratorio; máxime cuando, contrario a lo que indicó Sky Caterers en su carta de despido, este sí tenía autorización para trabajar en Puerto Rico. **Por esa razón, aunque la causa de acción no se configuró bajo la modalidad de discrimen por origen nacional, esta si constituyó una acción discriminatoria por condición social.**

Lamentablemente, una Mayoría de este Tribunal avala un resultado distinto a pesar de que el cuadro fáctico ante nuestra consideración evidencia discrimen por condición social por razón de extranjería y estatus migratorio. La Opinión Mayoritaria considera que estos no están protegidos por nuestra Constitución y, en consecuencia, por la Ley Núm. 100, por lo cual correspondía que el señor Jiménez Soto presentara una acción bajo la *Immigration Reform and Control Act of 1986* (IRCA, por sus siglas en inglés) ante la Sección de Derechos de Inmigrantes y Empleados del Departamento de Justicia de los Estados Unidos. Esto, aun cuando reconoce que hubo una modalidad de ánimo discriminatorio de parte de Sky Caterers. No coincido con esta conclusión.

En este caso, Sky Caterers asumió una postura discriminatoria al solo tomar en cuenta el estatus migratorio percibido del señor Jiménez Soto, aun cuando la ley aplicable establece que tenía autorización para trabajar en los Estados Unidos. Resulta ineludible arribar a la conclusión de que el

despido del señor Jiménez Soto constituye un acto de discrimen por razón de extranjería. Recuérdese que, en lo pertinente, el discrimen por extranjería ocurre cuando concurren actos discriminatorios sobre el estatus migratorio de aquella persona extranjera, la cual se entiende como aquella persona que es residente no ciudadana o residente permanente de nuestra jurisdicción.

La Opinión Mayoritaria considera que la extranjería o el estatus migratorio no están protegidos bajo la categoría de origen nacional protegida por la Ley Núm. 100. Coincido con esta determinación. No obstante, a diferencia de la Opinión Mayoritaria, considero que la extranjería o estatus migratorio son clasificaciones cobijadas por la categoría de condición social. Veamos.

Por mandato constitucional, la sociedad puertorriqueña queda obligada por a una política pública antidiscriminatoria que busca avalar la inviolabilidad de la dignidad de todo ser humano y respaldar la igualdad de todas personas ante la ley. Art. II, Sec. 1, Const. ELA. Este mandato se encuentra plasmado en el Art. 1 de la Ley Núm. 100, *supra*, cuyo propósito es proteger a trabajadores de actuaciones discriminatorias que infrinjan sus derechos constitucionales dentro del ámbito laboral, tal como le ocurrió al señor Jiménez Soto. Ese mismo mandato quedó estatuido en la Ley Núm. 100, *supra*, la cual dispone que el discrimen ocurre cuando un patrono despide, suspende o discrimina contra un empleado suyo con relación a diversas categorías y

clasificaciones, las cuales incluye la razón de condición social.

Según hemos explicado, las personas extranjeras son miembros de un sector marginado, y enmarcado por una situación socioeconómica precaria y desigual. Esto se debe a que las personas extranjeras sufren grandes perjuicios o agravios a causa de la opresión social y del trato diferencial que reciben a causa de la xenofobia, el racismo y, generalmente, de la otredad. Teniendo esto de vista, y a la luz del espíritu de nuestra Constitución, no debemos adoptar una interpretación estatutaria que limite el alcance de los derechos individuales y que no respete la inviolabilidad de la dignidad de todo ser humano.

Las personas extranjeras componen un grupo minoritario al que se le concede mayor deferencia judicial por constituir una clasificación inherentemente sospechosa. Recordemos que toda clasificación sospechosa "tiende a relegar a un estado legal de inferioridad a una clase con abstracción de las potencialidades y características individuales de sus miembros". Zachry International v. Tribunal Superior, 104 DPR 267, 282 (1975). Teniendo de vista que el discrimen por condición social protege a las personas que son discriminadas por su estatus económico o por su estatus social, y que el estatus social se refiere a una situación especial en la que se encuentra una persona o grupo en relación con las demás personas que componen la sociedad, resulta ineludible concluir que las personas extranjeras sufren discrimen por su

estatus económico y su estatus social a causa del estado legal inferior que ostentan.

De acuerdo con los hechos, la falta de ciudadanía del señor Jiménez Soto y las complicaciones que surgen de su clasificación como un trabajador migrante son la causa primordial de su despido. La interpretación más afín con el espíritu de nuestra Constitución conduce a la conclusión inequívoca de que el discrimen contra las personas extranjeras está subsumido en la categoría de discrimen por condición social.

No obstante, en su análisis, la Opinión Mayoritaria considera que la *Ley de Transformación y Flexibilidad Laboral*, Ley Núm. 4-2017, también conocida como la Reforma Laboral, tuvo el efecto de enmendar la Ley Núm. 100 de manera tal que su interpretación debe ceñirse por parámetros contenidos en los estatutos y reglamentos federales. Difiero de este proceder. El Art. 6.2 de la Reforma Laboral, dispone que:

> [al] aplicarse las disposiciones de cualquier ley de discrimen o represalia en el empleo, se reconocerá lo dispuesto en la legislación y reglamentación federal, al igual que las interpretaciones judiciales de las mismas de aquellos tribunales con jurisdicción en Puerto Rico, a los fines de asegurar interpretaciones consistentes en cuanto a términos o disposiciones similares, **salvo que las disposiciones de la legislación local requieran una interpretación distinta.** (Negrillas suplidas).29 LPRA sec. 123a.

A la luz del espíritu y alcance de nuestra Constitución, las disposiciones de la Ley Núm. 100 requieren una interpretación distinta. Esto nos permite una interpretación constitucional más adecuada a la política antidiscrimen que permea nuestro ordenamiento jurídico, y garantizar la

intención de la Ley Núm. 100 de proteger a todo tipo de trabajador contra el discrimen.

Finalmente, debemos considerar el planteamiento sobre que correspondía presentar la causa de acción ante los foros federales al amparo de la IRCA. Ya se ha rechazado el argumento de que toda legislación estatal que incide sobre la política inmigratoria queda desplazada por la cláusula de supremacía federal. Incluir la categoría de discrimen por extranjería o estatus migratorio en la Ley Núm. 100 no tiene el efecto de regular la inmigración o condición legal de los extranjeros en Puerto Rico. Tampoco tiene el efecto de prohibir, seleccionar o limitar la referida categoría legal. Ante esto la IRCA no desplaza las disposiciones antidiscriminatorias de la Ley Núm. 100. De Paz Lisk v. Aponte Roque, *supra*, págs. 479-480. La Ley Núm. 100 meramente busca proteger a víctimas de discrimen en el ámbito laboral al responsabilizar a aquel patrono que incurra en prácticas discriminatorias. Ante ello, se debe concluir que la inclusión de la extranjería como una categoría bajo condición social no conflige con las disposiciones federales pertinentes, por lo que no opera la doctrina de campo ocupado.

Así las cosas, confirmaría que las personas extranjeras satisfacen los requisitos para que se les aplique la garantía contra el discrimen por condición social. Los prejuicios culturales y sociales con que se les asocia, y el estatus social inferior que ostentan hace a las personas extranjeras acreedoras de protección. No cabe duda de que el trato desigual que sufren las personas extranjeras tiene un origen

sociocultural y, asimismo, carece de consideraciones objetivas y razonables que justifiquen su existencia.

Por consiguiente, contrario a lo que la Mayoría resuelve, considero que la Ley Núm. 100 prohíbe a todo patrono rehusar o dejar de emplear a una persona, o despedir, suspender o discriminar contra un empleado con relación a su sueldo y condiciones de trabajo **únicamente por el hecho de que el solicitante o empleado sea una persona extranjera**. Conforme al esquema de esa legislación, el empleado que sufre este tipo de discrimen está legitimado para presentar una acción sobre daños y perjuicios contra el patrono discriminador. 29 LPRA sec. 146. Hacer lo opuesto equivale a avalar la persistencia de un estigma que empobrece nuestro comportamiento colectivo y apoya la subyugación de un grupo marginado.

Maite D. Oronoz Rodríguez<br>
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Roberto Jiménez Soto y otros<br><br>Recurridos<br><br>v.<br><br>Carolina Catering Corp. h/n/c Sky Caterers, Management Group Investors, LLC<br><br>Peticionarios | CC-2023-0733 | <u>Certiorari</u> |

Opinión disidente emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 14 de enero de 2025.

> El legislador puede proveer justicia tan sólo en un plano relativamente general y abstracto. La tarea de realizar lo que Aristóteles llamó la "justicia animada", la de impartir justicia en el caso concreto le corresponde al juez[a].
> -Hon. José Trías Monge[1]

Hoy era nuestro deber pautar que despedir a una persona de su empleo por motivo de su estatus migratorio o condición de extranjería constituye una modalidad de discrimen por razón de condición social proscrita por la Ley Núm. 100 de 30 de junio de 1959, <u>infra</u>. De igual forma, y más importante, procedía reconocer que esta interpretación es

---

[1] J. Trías Monge, <u>Teoría de Adjudicación</u>, San Juan, Ed. Universidad de Puerto Rico, 2008, pág.400.

consistente con los principios constitucionales de inviolabilidad de la dignidad e igualdad humana. Esto se debe a que discriminar en contra de una persona por motivo de su estatus migratorio o condición de extranjería está subsumido en la prohibición constitucional de discriminación por motivo de origen o condición social. Todo ello porque, precisamente, es la referida Ley Núm. 100 la que implementa en el sector privado el propósito de la Sección 1 del Artículo II de la Constitución de Puerto Rico de repeler el discrimen en el empleo dentro de nuestro ordenamiento jurídico. Al una mayoría de los miembros de este Foro concluir lo contrario, respetuosamente disiento.

I.

El 25 de febrero de 2020, el Sr. Roberto Jiménez Soto, su esposa, la Sra. Diana Morales, y la sociedad legal de gananciales compuesta por ambos (Recurrido o señor Jiménez) presentaron una Demanda en virtud de la Ley Núm. 100 de 30 de junio de 1959, conocida como Ley contra el discrimen en el empleo, 29 LPRA sec. 146 et seq., y por daños y perjuicios en contra de Carolina Catering Corp., h/n/c Sky Caterers y Management Group Investors, LLC (Peticionario, Sky Caterers o patrono). En esencia, el señor Jiménez adujo que es ciudadano de la República Dominicana, que es residente legal permanente de los Estados Unidos y que fue despedido por el Peticionario tras haber sido objeto de discrimen por razón de su origen nacional **y/o por su**

**condición social, al ser percibido y tratado como un inmigrante ilegal.** En específico, alegó que el 18 de julio de 2018 fue despedido de forma discriminatoria por presuntamente no estar autorizado para trabajar en los Estados Unidos y sus territorios, debido a que su tarjeta de residencia o green card expiró ese mismo día.[2]

El 15 de julio de 2020, Sky Caterers contestó la demanda y, en síntesis, sostuvo que el despido se dio en atención a que, a la fecha de este, el señor Jiménez no tenía autorización para trabajar en el Aeropuerto Luis Muñoz Marín, ya que Aerostar Holdings, la compañía administradora, no emitiría la identificación correspondiente hasta que se presentara la tarjeta de residencia renovada.

Tras varios incidentes procesales, el 10 de febrero de 2021, el Peticionario presentó una Moción de sentencia sumaria en la que adujo que el Recurrido falló en demostrar un caso prima facie por discrimen ni tampoco logró demostrar la ausencia de una razón legítima que justificara su despido. Además, en la alternativa, arguyó que el despido fue justificado porque el señor Jiménez no tenía autorización para trabajar en los Estados Unidos y sus

---

[2]El Recurrido reclamó una indemnización, en virtud de la Ley Núm. 100, por los salarios y beneficios dejados de percibir desde la fecha del despido, así como por los ingresos futuros. Además, solicitó compensación por las angustias y sufrimientos mentales que experimentó bajo el Artículo 1802 del Código Civil de 1930, 31 LPRA ant. sec. 5141.

territorios por tener su tarjeta de residente expirada para la fecha en cuestión. Además, sostuvo que le ofreció reinstalarlo en su empleo una vez tomó conocimiento de la renovación de la tarjeta.

El Recurrido presentó una <u>Oposición a moción de sentencia sumaria y solicitud de sentencia sumaria a favor de la parte demandante</u>. En resumen, alegó que el Peticionario tenía conocimiento de que estaba autorizado para trabajar en los Estados Unidos y sus territorios, pues en un espacio de seis (6) meses, había verificado favorablemente la elegibilidad de empleo, y que la prueba de discrimen que presentó era directa al haber sido despedido por el vencimiento de su documento de identidad.[3] Por ello, reiteró que la razón del despido estaba relacionada con su origen nacional y estatus de ciudadanía. Sobre esto último, manifestó que, conforme con la normativa federal vigente, la expiración de su tarjeta de residencia permanente no impide que pueda mantener su autorización

---

[3]El señor Jiménez acompañó su solicitud con los siguientes documentos: **E-verify report, case verification number** 2018180204531HM del 29 de junio de 2018; **Verificación de elegibilidad de empleo (Formulario I-9) del 23 de octubre de 2017**; Lista de documentos aceptables (página 3 de Formulario I-9) **Verificación de elegibilidad de empleo (Formulario I-9) del 29 de junio de 2018**; Sección 2 del Formulario I-9 del 29 de junio de 2018; extractos de deposición al señor Jiménez; Formulario para entrevista; Pre-solicitud de empleo; **Aviso sobre participación en E-verify**; Precios para trámite de ID de Aerostar; documento titulado Departamento de Recursos Humanos de MGI; evidencia de cita con Aerostar; <u>Appointment Notice (Form I797C)</u>; entre otros.

para trabajar, sino que solo implica que debe renovar la tarjeta.

Por otro lado, el 8 de abril de 2021, el Peticionario presentó la Réplica a oposición a moción de sentencia sumaria y/o moción de desestimación por falta de jurisdicción. En esta, no atendió los hechos planteados por el señor Jiménez en su solicitud de sentencia sumaria, sino que alegó que el Tribunal de Primera Instancia carecía de jurisdicción para resolver la demanda. Al respecto, sostuvo que eran el Inmigrant and Employee Rights Section o, en la alternativa, The Office of the Chief Administrative Hearing Officer (OCAHO), los foros con jurisdicción exclusiva.[4]

El 3 de mayo de 2023, el Tribunal de Primera Instancia notificó una Sentencia Parcial en la que declaró con lugar la solicitud de sentencia sumaria del señor Jiménez. En esta, el foro primario identificó 85 determinaciones de hechos sobre los cuales no existía controversia y concluyó que la evidencia que presentó el señor Jiménez demostró que su despido fue ilegal y discriminatorio por nacionalidad. En particular, concluyó que, a partir de las propias admisiones del Peticionario y los hechos determinados, se cumplió con el esquema probatorio para los casos de discrimen según reconocido en McDonnell Douglas Corp. v.

---

[4] Este asunto jurisdiccional fue posteriormente resuelto mediante Sentencia por el Tribunal de Apelaciones.

Green, 411 US 792 (1973). Por todo ello, resolvió que Sky Caterers incurrió en conductas discriminatorias y ordenó la continuación de los procedimientos para dilucidar las partidas de daños.

Inconforme, Sky Caterers recurrió ante el Tribunal de Apelaciones, el cual, el 11 de octubre de 2023, dictó Sentencia confirmando la decisión del foro primario. En específico, resolvió que el señor Jiménez: (1) es de nacionalidad extranjera y por ello pertenece a una de las clases protegidas por el Título VII de la Ley federal de derechos civiles de 1964, 42 USC sec. 2000 et seq,; (2) fue entrevistado para el empleo, tuvo una recomendación favorable y verificación de elegibilidad el 29 de junio de 2018, por lo que estaba cualificado para ocupar el puesto; (3) fue despedido porque su tarjeta de residente permanente expiró, y (4) una vez el patrono advino en conocimiento de que había renovado la tarjeta, le ofreció reinstalarlo en el mismo puesto, lo que demostraba que el puesto permaneció disponible para personas con las mismas cualificaciones.[5]

Además, dispuso que el hecho de que la tarjeta de residencia expirara no significaba que la autorización para trabajar en los Estados Unidos y sus territorios hubiese expirado en virtud del Título 8 del Code of Federal

---

[5]Véase, Apéndice de certiorari, pág. 50

Regulations, 8 CFR sec. 274ª12.[6] Además, resolvió que exigirle al señor Jiménez presentar el documento específico, a pesar de ya haber sido constatada su elegibilidad, demostró un ánimo discriminatorio por razón de su nacionalidad.

Aún insatisfecho, el Peticionario acudió a este Tribunal mediante un recurso de Certiorari. En este, arguyó que erró el Tribunal de Apelaciones al determinar que el señor Jiménez estableció un caso prima facie de discrimen según el esquema probatorio aplicable en nuestra jurisdicción. Contando con la comparecencia de ambas partes, el caso quedó sometido.

Así las cosas, procedo a exponer el Derecho aplicable a la presente controversia y en el cual fundamento mi disenso.

II.

A.

Es conocido que al redactarse la Constitución de Puerto Rico se quiso "formular una Carta de Derechos de factura más ancha que la tradicional, que recogiese el sentir común de culturas diversas sobre nuevas categorías de derechos". Pueblo v. Figueroa Navarro, 104 DPR 721, 725

---

[6] "(1) An alien who is a lawful permanent resident (with or without conditions pursuant to section 216 of the Act), as evidenced by Form I-551 issued by the Service. An expiration date on the Form I-551 reflects only that the card must be renewed, not that the bearer's work authorization has expired;" Íd.

(1976); ELA v. Hermandad de Empleados, 104 DPR 436, 440 (1975). Esta Carta de Derechos refleja una importante influencia de la Declaración Universal de los Derechos Humanos, proclamada por las Naciones Unidas. J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 11. El resultado de esta influencia fue la adopción de "una de las cartas de derechos más liberales, más generosas y más automáticamente democráticas que se conocen hoy en día en el mundo". 2 Diario de Sesiones de la Convención Constituyente, pág. 1106.

Concretamente, esta visión generosa y democrática se conceptualizó en la Sección 1 de la Carta de Derechos de la Constitución de Puerto Rico al consagrar que

> **[l]a dignidad del ser humano es inviolable. Todos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de** raza, color, sexo, nacimiento, **origen** o **condición social**, ni ideas políticas o religiosas. **Tanto las leyes** como el sistema de instrucción pública **encarnarán estos principios de esencial igualdad humana.** Art. II, Sec. 1, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 277.

Al condenar el discrimen por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas, la Constitución reconoce un sistema jurídico humanitario que postula la dignidad del ser humano, su inviolabilidad e igualdad ante la ley. Zachry International v. Tribunal Superior, 104 DPR 267, 281 (1975). Con ello se intentan superar los accidentes

circunstanciales que tengan origen en la naturaleza o en la cultura. Íd.

En reiteradas ocasiones hemos reconocido que la inviolabilidad de la dignidad del ser humano es el principio cardinal sobre el cual se cimentan los derechos fundamentales de toda persona. Véanse, Ortiz González v. Burger King et al., 189 DPR 1 (2013); U.P.R. Aguadilla v. Lorenzo Hernández, 184 DPR 1001 (2012). Por ello, constituye el principio fundamental y rector de respeto hacia todas las personas. Díaz v. Wyndham Hotel Corp., 155 DPR 364, 379 (2001).

De esta manera, "[e]stos preceptos constitucionales demuestran el compromiso claro de los constituyentes en prohibir los discrímenes y la desigualdad en nuestro país". J.R. Roqué Velázquez, Apuntes hacia una definición del discrimen por "origen o condición social" en Puerto Rico, 26 Rev. Jur. UIPR 519, 519 (1992), citado en Garib Bazaín v. Hosp. Aux. Mutuo et al., 204 DPR 601, 647 (2020) (Op. disidente del Juez Asociado señor Estrella Martínez). Es por todo ello que la dignidad humana se considera el imperativo fundamental contra la discriminación. C.E. Ramos González, La inviolabilidad de la dignidad humana: Lo indigno de la búsqueda de expectativas razonables de intimidad en el derecho constitucional puertorriqueño, 45 Rev. Jur. UIPR 185, 186 (2010).

Conforme hemos resuelto, la Sección 1 del Art. II de la Constitución opera sin necesidad de ley que la implemente. Figueroa Ferrer v. E.L.A., 107 DPR 250, 259-60 (1978); E.L.A. v. Hermandad de Empleados, supra, pág. 440. Alberio Quiñones v. E.L.A., 90 DPR 812, 816 (1964). Así, la protección extendida a la dignidad del ser humano no es en nuestro ordenamiento una entidad errante en busca de autor o encasillado jurídico, sino que la Constitución la consagra en texto claro. Figueroa Ferrer v. E.L.A., supra.[7]

De esta forma, la "dignidad es ahora inalienable en todos los seres humanos y existe en idéntica magnitud en cada uno de ellos. Es el imperativo fundamental contra la discriminación". C.E. Ramos González, op. cit., pág. 186.

Conviene recordar que la intención manifiesta de la Sección 1 fue

> fijar claramente como base consustancial de todo lo que sigue el **principio de la dignidad del ser humano** y, como consecuencia de ésta, **la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño.** En cuanto fuera menester **nuestra organización legal** queda robustecida por la presente disposición constitucional, a la vez **que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto.**

---

[7] A igual conclusión hemos llegado en cuanto a la Sección 8 del mismo Artículo II (derecho a la intimidad). Véase, Figueroa Ferrer v. E.L.A., supra.

(Negrillas suplidas). 4 <u>Diario de Sesiones de la Convención Constituyente</u>, 2561, (ed. 1962).

B.

Como vimos, en la Sección 1 de la Constitución también se dispone que todas las personas somos iguales ante la ley, lo que se conoce como el principio de igualdad. Este último surge como resultado del principio de la inviolabilidad de la dignidad, y por ello ambos preceptos están estrechamente relacionados. 4 <u>Diario de Sesiones de la Convención Constituyente</u>, 2561, (ed. 1962). Paralelamente, la Sección 7 del Artículo II de la Carta de Derechos consagra que no "se negará a persona alguna en Puerto Rico la igual protección de las leyes". Art. II, Sec. 7, Const. ELA, supra.[8] A causa de ello, hemos expresado que la igualdad es el ingrediente medular del ideal de justicia que constantemente late en la constitución. <u>P.R.P. v. ELA</u>, 115 DPR 631, 633 (1984).

Es norma conocida en el derecho constitucional que el derecho a la igual protección de las leyes se activa cuando nos enfrentamos a una legislación o una acción estatal que crea clasificaciones entre grupos, discriminando a unos frente a otros. <u>Pérez Rodríguez v. López Rodríguez</u>, 210 DPR 163, 215 (2022) (Op. de conformidad del Juez Asociado señor Colón Pérez); <u>Berberena v. Echegoyen</u>, 128 DPR 864, 878 (1991). En

---

[8]Véase, Emda. XIV, Const. EE.UU., LPRA, Tomo 1.

esencia, esta garantía no exige un trato igual a todas las personas, sino que prohíbe el trato desigual injustificado. Berberena v. Echegoyen, supra; Zachry International v. Tribunal Superior, supra, págs. 276-277. Lo anterior, pues la igual protección de las leyes encuentra su base constitucional en el principio cardinal de trato similar para personas similarmente situadas. Véanse: Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 70 (2010); López v. E.L.A., 165 DPR 280, 297 (2005). Véase, además, R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. PR, 1988, Vol. II, pág. 1082.

Consecuentemente, hemos reiterado que, al enfrentar una clasificación sospechosa o que afecta algún derecho fundamental debemos aplicar un análisis de escrutinio estricto o riguroso. AAR, Ex parte, 187 DPR 835, 864 (2013); Domínguez Castro et al. v. E.L.A. I, supra, pág. 73; San Miguel Lorenzana v. E.L.A., supra, pág. 425.[9] Así, hemos reconocido que existen ciertas áreas que, por su tangencia con los principios de inviolabilidad de la dignidad humana y de que todas las personas son iguales ante la ley, serán inherentemente sospechosas y, por ello, estarán sujetas a un minucioso examen judicial. Como, por

---

[9]Véase, además, J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, págs. 815-816.

ejemplo, las clasificaciones o discrímenes por motivo de raza, color, sexo, nacimiento, **origen o condición social**, ideas políticas o religiosas y **nacionalidad**. López v. ELA, supra, pág. 308; Wackenhut v. Rodríguez Aponte, 100 DPR 518, 531 (1972); Graham v. Richardson, 403 U.S. 365, 371-372 (1971).

Es importante resaltar que las clasificaciones sospechosas son aquellas cuyas características no guardan relación con la habilidad o aptitud de las personas afectadas por la clasificación. Zachry International v. Tribunal Superior, supra, nota 9 (citas omitidas). De esta manera, una clasificación sospechosa "tiende a relegar a un estado legal de inferioridad a una clase con abstracción de las potencialidades y características individuales de sus miembros. Íd., pág. 282.

C.

En la encomiable protección de las garantías y derechos personales, los constituyentes consignaron la regla de hermenéutica que debe guiar nuestra función indelegable de interpretar la Carta de Derechos. En específico, en la Sección 19 se reconoció que "[l]a enumeración de "[los] derechos que antecede **no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente**". (Negrillas suplidas). Art. II, Sec. 19, Const. PR, supra, pág. 399.

Nos comenta el Profesor Farinacci Fernós que esta regla de hermenéutica, contenida expresamente en la Constitución, contiene instrucciones interpretativas vinculantes para los tribunales, pues estamos obligados a seguirlas y ponerlas en vigor. J.M. Farinacci Fernós, La Carta de Derechos, 1ra ed., San Juan, Ed. Universidad Interamericana de Puerto Rico, 2021, pág. 14. En concreto, nos señala que este mandato de interpretación y construcción de los derechos allí enumerados debe hacerse extensivamente, no solo con respecto a los derechos allí enumerados, sino también en cuanto a su contenido y extensión normativa. Íd., pág. 16 (cita omitida).

Al respecto, la Comisión de la Carta de Derechos de la Convención constituyente sostuvo que esta regla de interpretación procura proteger los derechos del individuo contra una interpretación restrictiva o contra una interpretación basada en la norma conocida de inclusio unius, exclusio alterius, la cual establece que el acto de enumerar conlleva necesariamente el acto de excluir y descartar todo lo que no se menciona. 4 Diario de Sesiones de la Convención Constituyente, 2576, (ed. 1962). Por el contrario, se reconoció que este principio de inflexibilidad no debería incorporarse en nuestra constitución. Íd. En particular, se señaló que recurrir a este tipo de interpretación "sería contraria a la actitud básica que ha regido a la Comisión [de la Carta de Derechos]

al preferir el lenguaje breve de los grandes principios en vez de la formulación minuciosa de los detalles inagotables". Íd.

En consecuencia, la Sección 1 de la Carta de Derechos es numerus apertus, lo que implica que pueden existir clasificaciones prohibidas que no están expresamente señaladas en la disposición constitucional. Garib Bazaín v. Hosp. Aux. Mutuo et al., supra, pág. 651 (Op. disidente del Juez Asociado señor Estrella Martínez). En ese sentido, es distinta a la Constitución de los Estados Unidos de América que profesa un status negatis libertatis (que el Estado se abstenga de infringir los derechos de los ciudadanos), pues, en la Constitución de Puerto Rico rige un status creditoris (se le exige al Estado una acción positiva en beneficio del individuo). Íd.

Como podemos observar, y como muy bien lo expresó el delegado Jaime Benítez, al interpretar los derechos consignados en la Carta de Derechos debemos evitar incurrir en una actitud restrictiva. Por el contrario, estamos llamados a interpretarlos en su plenitud. Véase, 2 Diario de Sesiones, supra, pág. 1105.

D.

Como hemos reseñado, desde el origen de la Constitución de Puerto Rico existe en nuestro ordenamiento una vigorosa política pública dirigida a erradicar todo tipo de discrimen en nuestra sociedad. Santini Rivera v.

Serv. Air, Inc., 137 DPR 1, 12 (1994). Cónsono con esto, mediante la Ley Núm. 100 de 30 de junio de 1959, 29 LPRA sec. 146 et seq., (Ley Núm. 100), se extendió el lenguaje constitucional que establece la Sección 1 del Artículo II, supra, para así prohibir el discrimen en las relaciones obrero-patronales en el ámbito privado. S.L.G. Afanador v. Roger Electric Co. Inc., 156 DPR 651, 661 (2002); Díaz v. Wyndham Hotel Corp., supra, pág. 380; Rodríguez Meléndez v. Sup. Amigo, Inc., 126 DPR 117, 124 (1990).[10]

El propósito del estatuto es proteger a los empleados o aspirantes a empleo de la empresa privada contra el discrimen por edad, raza, color, sexo, orientación sexual, identidad de género, **origen social o nacional**, **condición social**, afiliación política, ideas políticas o religiosas, o por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, o por ser militar, ex-

---

[10]Al aprobarse originalmente la Ley Núm. 100, solamente se incluyeron las categorías siguientes: edad avanzada, raza, color, religión, origen o condición social. Nótese que, actualmente el estatuto incluye categorías que no están expresamente contenidas en la Constitución, pues surgieron mediante enmiendas posteriores. Entre estas se encuentran: sexo, orientación sexual, identidad de género, **origen nacional**, afiliación política, entre otras. Ahora bien, todas estas enmiendas reafirman el objetivo principal de la Asamblea Legislativa de proveer un mecanismo de protección para los trabajadores y aspirantes de empleo y "convertirla en una de vanguardia que sirva a los mejores intereses de la clase trabajadora del país". Véase, Informe Conjunto de las Comisiones de Gobierno, de Trabajo y de lo Jurídico del Senado sobre el P. del S. 929, pág. 1. Véase, además, Santini Rivera v. Serv. Air, Inc., supra, pág. 29 y nota 17.

militar, servir o haber servido en las Fuerzas Armadas de los Estados Unidos, o por ostentar la condición de veterano. Art. 1 de la Ley Núm. 100, 29 LPRA sec. 146. Véase, <u>Santini Rivera v. Serv. Air, Inc.</u>, supra, pág. 4.

De esta forma, el estatuto establece responsabilidad civil y penal para aquellos patronos privados que discriminen contra empleados o aspirantes a empleo, y provee una causa de acción civil en daños y perjuicios para la persona discriminada. <u>Díaz v. Wyndham Hotel Corp.</u>, supra, pág. 381; <u>García Pagán v. Shirley Caribbean</u>, 122 DPR 193, 198 (1988). Véanse, 29 LPRA sec. 146 <u>et seq</u>.

En lo aquí pertinente, fue mediante la enmienda introducida por la Ley Núm. 67 de 3 de junio de 1983, que se incorporó en la Ley Núm. 100 la prohibición del discrimen en el empleo por razón de origen nacional.[11] En su Exposición de Motivos se dispuso:

> La política pública del Departamento del Trabajo y Recursos Humanos en el área de empleo es fomentar el uso máximo de los recursos humanos disponibles en la fuerza laboral del país. Por tal razón se presta una atención preponderante al problema social del discrimen en el empleo. La Ley Núm. 100 de 30 de junio de 1959, según enmendada, recoge los postulados de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico. En el año 1975 el Departamento del Trabajo y Recursos Humanos inaugura la División Antidiscrimen a los fines de implementar la ley antes mencionada, desalentando así el discrimen en el empleo tanto a aspirantes de empleo como empleados, expresamente la ley prohíbe el discrimen por razón de raza, color, sexo, edad,

---

[11]La mencionada enmienda también introdujo cambios a la prohibición de discrimen por motivo de edad.

origen o condición social e ideas políticas y religiosas. Siendo el mismo uno de vanguardia, encontramos que no ofrece protección en el área de discrimen en el empleo por razón de origen nacional.

En la actualidad el término origen o condición social son utilizados como sinónimos y no como áreas separadas con significados distintos. Por tal razón se hace necesario incorporar a nuestra legislación el discrimen por razón de origen nacional.

En adición encontramos que es necesario que nuestra legislación esté a tono con el Título VII de la Ley Federal de Derechos Civiles de 1964, según enmendado. Dicha ley cubre el origen nacional como causa de discrimen. […] Exposición de Motivos, Ley Núm. 67 de 3 de junio de 1983.[12]

En el Informe Conjunto del Senado, al discutirse el alcance de la mencionada enmienda, se clarificó que la mención de origen o condición social en la Sección 1 del Artículo II se utiliza para significar el ambiente social en el que se desarrolla y desenvuelve una **persona, y no el país o nacionalidad de donde procede la persona.** (Negrillas suplidas). P del S. 929, Informe Conjunto de las Comisiones de Gobierno, de Trabajo y de los Jurídico, 20 de abril de 1983, pág. 2. Similarmente, se explicó que el Título VII de la Ley Federal de Derechos Civiles de 1964, incluye el discrimen por origen nacional, y que ello hacía necesario que, por medio de la Unidad Antidiscrimen del Departamento del Trabajo y Recursos Humanos de nuestra jurisdicción, se armonizaran **"ambos estatutos a los fines**

---

[12]Véase además el P. del S. 929 del 10 de marzo de 1983.

**de conseguir la máxima protección a los empleados y aspirantes de empleo bajo ambos ordenamientos legales**". (Negrillas suplidas). Íd., pág. 2.

En consecuencia, se expuso que con la referida enmienda se ampliarían las protecciones a las personas que válidamente residen en nuestro país y así se armonizaría perfectamente con la disposición constitucional de la Sección 1 de la Carta de Derechos. Íd., pág. 3. Sin embargo, se especificó que nunca podría reclamar protección por discrimen por origen nacional una persona que residiera ilegalmente en nuestro país. Íd.

Paralelamente, en el Informe a la Cámara de Representantes por la Comisión del Trabajo y Asuntos del Veterano del 23 de abril de 1983, se indicó que la enmienda iba dirigida a "reforzar la prohibición de discrimen por razón de raza, color, sexo, origen o condición social, ya que el origen nacional se utiliza frecuentemente para significar el ambiente social, en que se desarrolla y desenvuelve una persona y no el país o nacionalidad de donde procede la misma". P del S. 929, Informe a la Cámara de Representantes, 23 de abril de 1983. Similar al Informe Conjunto del Senado, este también hizo referencia a la compatibilidad con el Título VII de la Ley Federal de Derechos Civiles, supra, y a **la necesidad de que mediante ambos estatutos se le brinde una máxima protección a los**

**empleados y aspirantes de empleo bajo ambos ordenamientos legales**. Íd.

En síntesis, queda claro que en nuestro ordenamiento jurídico existe una clara política pública, de origen dual, constitucional y estatutaria, que prohíbe el discrimen por razón de origen nacional. En la vertiente estatutaria, se reconoce expresamente la prohibición al trato discriminatorio hacia empleados o aspirantes por motivo de origen nacional. Santini Rivera v. Serv. Air, Inc., supra. pág. 13.

E.

En este punto ya hemos observado que tanto la Constitución de Puerto Rico como su contraparte estatutaria, la Ley Núm. 100, prohíben el discrimen por origen o condición social. Por esta razón, nos comenta el Profesor Rivera Juanatey que, al interpretar la prohibición dispuesta en el Artículo 1 de la Ley Núm. 100, se deberá tomar en cuenta el análisis interpretativo de la Sección 1 de la Carta de Derechos. De esta forma, el alcance de los discrímenes dispuestos en la Ley Núm. 100 debe ser análogo al de las clasificaciones constitucionalmente prohibidas. Eduardo J. Rivera Juanatey, Discrimen Por Antecedentes Penales: Hacia Una Reconsideración Del Discrimen Por Condición Social, 41 Rev. Jur. U.I.P.R. 585, 595 (2007). Como resultado, se empleará uniformemente la protección constitucional

provista a los ciudanos frente al Estado y la protección estatutaria frente a patronos privados. Íd.

En cuanto a la inclusión en nuestra ley suprema, en el Informe de la Comisión de Carta de Derechos se explicó que "origen social" reafirma "**el principio de descartar toda** gradación, favoritismo o **prejuicio al sopesar los méritos de una causa judicial**, de una solicitud en el servicio público, de una subasta, etc., **por motivos de origen o condición social**". 4 Diario de Sesiones, supra, pág. 2562.

Ahora bien, y de vital importancia para la correcta resolución de la controversia ante nos, al debatirse la enmienda propuesta por el delegado Lino Padrón Rivera de cambiar "origen social" a "origen o condición social", como finalmente quedó aprobado en la Sección 1, el delegado Jaime Benítez, presidente de la Comisión de la Carta de Derechos, expresó

> …**lo que se ha establecido aquí son ciertos principios básicos y esenciales que tienen fuerza ex proprio vigore, pero que además de tener fuerza por su propio vigor habrán de requerir implementación de dos clases,** educativa y **jurídica**… En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país, se subraya la inconstitucionalidad de todo favoritismo. Y todo reconocimiento a distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento. En lo que toca a qué es lo que se quiere decir con origen social, quiérase decir con origen social, **que no importa la extracción de la persona, su situación económica, su condición en la comunidad, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico**

**son iguales ante nuestras leyes** si se aprueba esta disposición y **cualquier intento de hacer discrimen en favor o en contra de una de ellas es ilegal.** (Negrillas suplidas). 2 Diario de Sesiones, supra, pág. 1382.

Además, el delegado Benítez explicó que el lenguaje era análogo al consignado en el Artículo 2 de la Carta de Derechos del Hombre, en la que "[t]oda persona tiene todos los derechos, libertades proclamadas en esta declaración sin distinción alguna de raza, color, sexo, religión, idioma, opinión política o de cualquier otra índole, **origen social, origen nacional o social".** 2 Diario de Sesiones, supra, pág. 1382.[13]

Ante este panorama, y tal como lo expresé en Garib Bazaín v. Hosp. Aux. Mutuo et al., no tengo duda de que la prohibición del discrimen por origen o condición social va más allá de la naturaleza o la procedencia social de

---

[13]El Artículo II de la Declaración Universal de Derechos Humanos, aprobada el 10 de diciembre de 1948, y a la cual se hizo referencia, dispone:

> Toda persona tiene los derechos y libertades proclamados en esta Declaración, sin distinción alguna de raza, color, sexo, idioma, religión, opinión política o de cualquier otra índole, origen nacional o social, posición económica, nacimiento o cualquier otra condición.

> Además, no se hará distinción alguna fundada en la condición política, jurídica o internacional del país o territorio de cuya jurisdicción dependa una persona, tanto si se trata de un país independiente, como de un territorio bajo administración fiduciaria, no autónomo o sometido a cualquier otra limitación de soberanía.

la persona, sino que incluye, a su vez, la condición o el estatus de las personas en la sociedad puertorriqueña. Garib Bazaín v. Hosp. Aux. Mutuo et al., pág. 653 (2020) (Op. disidente del Juez Asociado señor Estrella Martínez).

Al respecto, nos comenta el Profesor José R. Roqué Velázquez que el discrimen por origen o condición social se materializa en dos vertientes. J.R. Roqué Velázquez, Apuntes hacia una definición del discrimen por "origen o condición social" en Puerto Rico, supra, pág. 524. La primera constituye el discrimen motivado por el origen o la procedencia social o económica de una persona, como lo sería el discriminar por haber nacido en un lugar pobre o rico, por tener poca o mucha educación, o por tener padres impedidos, entre otros. Íd., pág. 525. En la segunda vertiente se prohíbe el discrimen por la condición social, o sea, el **estatus que la persona ostente en la jerarquía socio-económica**. Íd., págs. 523-524. En cuanto a esta última, señaló que la posición ante el círculo social o el círculo económico que adquiera una persona no puede ser utilizada por el Estado como base para discriminar. Íd., pág. 524.

Cobra mayor importancia que, ante la insistencia del delegado Lionel Fernández Méndez para que se clarificara qué mecanismo o remedio tendría la persona afectada para protegerse de una acción injusta de discrimen, el delegado Benítez expresó que "**[l]a Carta de Derechos no provee el**

**mecanismo para instrumentar estos derechos, y si intentase proveerlos sería en toda probabilidad un error de parte suya. La responsabilidad de establecer los mecanismos necesarios para validar estos principios corresponderá al poder legislativo"**. (Negrillas suplidas). Íd., pág. 1383. Como vimos, no tengo duda de que esto fue precisamente lo que hizo la Asamblea Legislativa mediante la Ley Núm. 100, no solo al extender a la esfera privada la protección contra el discrimen contenida en nuestra ley suprema, sino también al instrumentalizar la reclamación mediante una causa de acción civil y otra de carácter penal en los tribunales de nuestra jurisdicción.

Ante ese cuadro, restaba que este Tribunal le diera el mayor contenido jurisprudencial posible a estos principios, para erradicar esta modalidad de discrimen por origen o condición social.[14]

---

[14]En múltiples ocasiones, distintos miembros de este Tribunal han intentado definir el alcance, los contornos y las implicaciones del discrimen por origen y condición social mediante opiniones concurrentes, disidentes y de conformidad. Véanse, Rosario v. Toyota, 166 DPR 1 (2005) (Sentencia con opiniones disidentes); Berberena v. Echegoyen, supra, (Opinión disidente del Juez Asociado señor Rebollo López); Vega v. Luna Torres, 126 DPR 370 (1990) (Op. concurrente y de conformidad del Juez Asociado señor Hernández Denton); Vicéns v. UPR, 117 DPR 771 (1986)(Voto particular disidente del Juez Asociado señor Negrón García); Molina v. C.R.U.V., 114 DPR 295 (1983) (Op. concurrente del Juez Asociado señor Irizarry Yunqué); Pueblo v. Caro González, 110 DPR 518 (1980) (Voto concurrente del Juez Asociado señor Díaz Cruz), entre otros.

III.

A la altura de estos tiempos, los principios constitucionales de igualdad y la inviolabilidad de la dignidad humana exigen que protejamos los derechos fundamentales de todas las personas, independientemente de su procedencia, **nacionalidad**, sexo, raza, género, religión y **condición social**. (Negrillas suplidas) Garib Bazaín v. Hosp. Aux.—Mutuo et al., supra, pág. 645 (Op. disidente del Juez Asociado señor Estrella Martínez). Como detallé, mediante la Ley Núm. 100 se materializó la política constitucional, consagrada en la Sección 1 de la Carta de Derechos, de proteger a las personas trabajadoras y aspirantes del discrimen en el empleo.

Del mismo modo, surge del derecho precitado que las clasificaciones prohibidas en la Ley Núm. 100, al igual que las categorías dispuestas en la Sección 1 de la Carta de Derechos, no son exhaustivas, pues se ha reiterado que las categorías proscritas por la Ley Núm. 100 están íntimamente vinculadas a la Sección 1 de la Carta de Derechos. Garib Bazaín v. Hosp. Aux. Mutuo et al., supra, págs. 670-671 (Op. disidente del Juez Asociado señor Estrella Martínez) (citando a Meléndez Rivera v. CFSE, 195 DPR 300, 306 (2016); García Pagán v. Shiley Caribbean, etc., supra, pág. 198.

En palabras del Profesor Farinacci Fernós, la Sección

opera, en todo su alcance, mediante la Ley Núm. 100, incluyendo su naturaleza expansiva y no-taxativa. J.M. Farinacci Fernós, Igual trato por igual trabajo: Las clasificaciones laborales irracionales y el trato desigual en el empleo privado, 50 Rev. Jur. UIPR 311, 326 (2015). Consecuentemente, al encontrarnos ante una controversia sobre el alcance y las implicaciones de alguna categoría contenida en la Ley Núm. 100, nuestro análisis no puede ignorar la intención constitucional expresa de reconocer y expandir los principios de inviolabilidad de la dignidad humana e igualdad.

En ese sentido, sostengo que concluir lo contrario nos conduciría al contrasentido de utilizar el texto inanimado y aislado de la Ley Núm. 100 como escudo para no reconocer las garantías constitucionales de nuestra Carta Magna. En otras palabras, la Ley Núm. 100 no puede ser una camisa de fuerza que impida la protección de derechos y la concesión de remedios garantizados en la Constitución. Ciertamente, dicho proceder nos apartaría de realizar una interpretación armoniosa que cumpla con la política pública en materia laboral.

Al respecto, nos comenta el Profesor Rivera Juanatey que el principio constitucional de igualdad podría verse frecuentemente coartado de no existir expresamente en nuestra Carta de Derechos la prohibición del **discrimen** por razón de "origen o condición social", y que "[l]a amplitud

del concepto permite atemperar a nuestros tiempos la protección constitucional otorgada al grupo de personas que por razón de su realidad social se les priva de ciertos derechos garantizados al resto de los ciudadanos". E.J. Rivera Juanatey, Discrimen por antecedentes penales: Hacia una reconsideración del discrimen por condición social, 41 Rev. Jur. UIPR 585, 585 (2007) (citas omitidas).

Precisamente, en este quehacer judicial de interpretar los contornos de la Constitución de Puerto Rico, debemos garantizar su vigorosidad y relevancia a los problemas socio-económicos y políticos de nuestro tiempo. López Vives v. Policía de P.R., 118 DPR 219, 227 (1987). A fin de cuentas, la permanencia y estabilidad de nuestra Constitución depende, en última instancia, de su capacidad para responder a los distintos problemas sociales, económicos y políticos a los que se enfrenta el país. Como intérpretes máximos de este documento, no podemos limitar su alcance ni congelar sus principios a la época en que se promulgaron. P.I.P. v. C.E.E., 120 DPR 580, 613 (1988). Véase, Nogueras v. Hernández Colón I, 127 DPR 405, 411, (1990).

### IV.

Consignado todo esto, tengo la certeza de que en este caso el señor Jiménez está cobijado por la protección, tanto constitucional como estatutaria, que le prohíbe al patrono el discrimen por condición social en su segunda

vertiente. De esta forma, despedir al señor Jiménez de su empleo porque presuntamente no estaba autorizado para trabajar en nuestra jurisdicción y, en consecuencia, ser percibido como una persona con estatus migratorio incierto, siendo un residente legal permanente, constituyó una conducta discriminatoria fundamentada en el origen y procedencia social, así como en la condición y el **estatus social** de este. En otras palabras, el ser un extranjero, ya sea con estatus migratorio incierto o con residencia legal permanente, constituye sin duda alguna una condición social que debe gozar de las protecciones reconocidas en nuestro ordenamiento. Tengo la certeza de que el principio de inviolabilidad de la dignidad humana, consagrado en nuestra Carta de Derechos y extendido mediante la Ley Núm. 100, salvaguarda al inmigrante.

Ante este escenario, era imperioso resolver que la actuación del patrono subsumió al señor Jiménez a una categoría de segunda clase, lo que activó la protección dual contra el discrimen por condición social. Procedía descartar cualquier otro acercamiento que limitara el alcance de ese derecho constitucional, así como cualquier otro que lacerara los principios de igualdad y dignidad humana.[15]

---

[15] "De ordinario, un despido motivado por un discrimen provoca hondas angustias y pesares, no sólo al empleado, sino a su familia, ello debido no sólo a las consecuencias patrimoniales de encontrarse desempleado con los obvios

Este resultado es cónsono con la visión de ensanchar las disposiciones constitucionales contenidas en la Sección 1 de la Carta de Derechos e interpretar la frase "condición social" de forma amplia, pues "[e]llo iría acorde con la intención de nuestros constituyentes y armonizaría nuestro texto constitucional con la principal fuente de inspiración en cuanto nuestra política anti-discrimen: la Declaración Universal de los Derechos Humanos". J.M. Farinacci Fernós y G. Rivera Vega, El uso de fuentes transnacionales en el Derecho puertorriqueño (Parte I), 51 (Núm. 1) Rev. Jur. UIPR 189, 211 (2016-2017). No olvidemos, que esta Sección 1 opera ex proprio vigore y que la intención expresa de los constituyentes fue el reconocer que

> [...] la dignidad del ser humano es inviolable. **Esta es la piedra angular y básica de la democracia.** En ella radica su profunda fuerza y vitalidad moral. Porque antes que ninguna otra cosa, es la democracia una fuerza moral, y su moral radica precisamente en el reconocimiento que hace de la dignidad del ser humano, del alto respeto que esa dignidad merita **y la responsabilidad en consecuencia que tiene todo el orden constitucional de descansar en ella, protegerla y defenderla.** Por eso en nuestra primera disposición además **de sentar inicialmente esta base de la igualdad profunda del ser humano—igualdad que trasciende cualquier diferencia,** bien sea diferencia biológica, bien sea diferencia ideológica, religiosa, **política o cultural—por encima de**

---

efectos de esta situación sobre los miembros del núcleo familiar, sino a las consecuencias psicológicas y sociales que resultan de un despido injusto e injustificado"... Santini Rivera v. Serv. Air, Inc., supra, pág. 15 (Op. de conformidad del Juez Asociado señor Hernández Denton).

**tales diferencias está el ser humano en su profunda dignidad trascendente**. Y por eso decimos que el sistema de leyes y el sistema de instrucción pública habrán ambos de encarnar estos principios válidos y eternos. (Negrillas suplidas) Jaime Benitez, Presidente de la Comisión de Carta de Derechos, 2 Diario de Sesiones, supra, pág. 1103.

V.

Sostengo que al mismo resultado deberíamos haber llegado si este análisis hubiese sido exclusivamente bajo el concepto de "origen nacional" dispuesto en la Ley Núm. 100. Anteriormente, esta Curia expresó que la enmienda de 1983 a la Ley Núm. 100, que añadió el calificativo "social o nacional" después de la palabra "origen", se hizo para "prohibir el discrimen por extranjería". Garib Bazaín v. Hosp. Aux. Mutuo et al., supra, pág. 619.

En lo pertinente, si bien durante la Asamblea Constituyente no se concibió el discrimen por nacionalidad como uno de los que expresamente se prohíben en la Sección 1 del Artículo II, en Wackenhut v. Rodríguez Aponte, supra, pág. 531, se añadió el vocablo "nacionalidad" al catálogo del Art. II, Sec. 1 de la Constitución en reconocimiento, como reseñamos previamente, de que esta disposición no es numerus clausus. De Paz Lisk v. Aponte Roque, 124 DPR 472 (1989). Véase, Santini Rivera v. Serv. Air, Inc., supra, pág. 13.

En cuanto a esto, anteriormente reconocimos que, aunque el mandato constitucional que prohíbe el discrimen por razón de nacionalidad constituye de por sí una

limitación al ejercicio de los poderes del Estado conforme al principio de "acción de estado", del mismo modo expresamos **que en términos axiológicos dicha limitación no disminuye el hecho que en nuestro sistema jurídico la prohibición del discrimen constituye un valor jurídico de la más alta jerarquía**. Santini Rivera v. Serv. Air, Inc., supra, pág. 13, nota 4.

Sobre este particular, es conveniente detenernos y reseñar brevemente lo acontecido en De Paz Lisk v. Aponte Roque, supra. En este caso, la Sr. Minerva De Paz Lisk (señora De Paz Lisk) era ciudadana de la República Dominicana y residente legal desde el 1978, en virtud de un visado permanente expedido por el Servicio de Inmigración y Naturalización de los Estado Unidos de América. La señora De Paz Lisk terminó sus estudios universitarios en educación secundaria y solicitó al Departamento de Instrucción Pública[16] (Departamento) que le expidiera su certificación de maestro. Su solicitud fue rechazada por incumplir con el requisito de ciudadanía dispuesto en el Artículo 5 de La Ley Núm. 94 de 21 de junio de 1953, 18 LPRA sec. 264, el cual exigía a todo candidato a obtener la certificación de maestro que fuera ciudadano de los Estados Unidos de América. La señora De Paz Lisk demandó al Departamento y alegó que tal requisito

---

[16] Hoy día reconocido oficialmente como el Departamento de Educación de Puerto Rico.

constituía un discrimen por razón de extranjería, en violación a las cláusulas del debido proceso de ley e igual protección de las leyes de la Constitución de Puerto Rico.

En lo pertinente, el Artículo impugnado se declaró inconstitucional tras determinarse que no existía un interés apremiante que justificara una clasificación sospechosa basada en la ciudadanía. En esencia, se resolvió que el requisito de ciudadanía era irrelevante en la determinación de idoneidad profesional, eliminaba a candidatos valiosos y resultaba injusto desde el punto de vista de los derechos fundamentales. Asimismo, se determinó que la disposición impugnada atentaba contra los principios de igualdad contenidos en las Secciones 1 y 7 del Artículo II de la Carta de Derechos. De Paz Lisk v. Aponte Roque, supra.

Nótese que este importante precedente nos reitera no solamente que la lista de categorías contenido en la Sección 1 de la Carta de Derechos no es taxativo, sino también el reconocimiento del derecho constitucional fundamental a la prohibición del discrimen en el empleo por razón de su nacionalidad. Este ejercicio interpretativo era el que nos exigía el caso ante nuestra atención, al dar alcance y contenido a las categorías dispuestas en la Ley Núm. 100, como la prohibición del discrimen por "origen nacional" y "condición social".

Este ejercicio no nos resulta desconocido, pues, por ejemplo, en Rodríguez Meléndez v. Supermercados Amigos, 126 DPR 117 (1990), resolvimos que el hostigamiento sexual constituye una modalidad de discrimen por razón de sexo proscrito por la Ley Núm. 100. ("A fin de cuentas, hostigar es sinónimo de perseguir o molestar, actuación que necesariamente conlleva diferente trato hacia una persona; esto es, de índole discriminatorio en su contra.) Íd., pág. 124.

Adviértase, ahí yace el contraste entre un tribunal vanguardista y garante de las protecciones constitucionales versus uno caracterizado por un acercamiento en extremo formalista. Este último deja a un lado las normas vinculantes de hermenéutica consagradas en la Sección 19 de la Carta de Derechos, supra, las cuales nos exigen una interpretación liberal, entiéndase, no restrictiva, de los derechos allí consignados. Es decir, de haber seguido la misma metodología utilizada hoy por una mayoría en Rodríguez Meléndez v. Supermercados Amigos, supra, probablemente se hubiese resuelto que, debido a que el concepto de "hostigamiento" no estaba incluido expresamente en la Ley Núm. 100, la protección solamente se refería a prohibir el trato dispar entre hombre y mujer.

En el caso ante nos, la opinión mayoritaria intenta en múltiples ocasiones hacer una distinción entre los conceptos de "ciudadanía" y "estatus migratorio" para, en

esencia, concluir que estos no tienen cabida bajo la Ley Núm. 100, sino bajo otros estatus federales, como la Ley de Reforma y Control de Inmigración (IRCA, por sus siglas en inglés). Ahora bien, me preocupa este método de interpretación textualista y formalista que nos arroja el lamentable saldo de hoy, al resolver que el discrimen por estatus migratorio no tiene una desaprobación en las garantías constitucionales y estatutarias contra el discrimen. Reitero que la Ley Núm. 100 recoge los principios constitucionales y, por ello, requiere que su interpretación se atemperare a los cambios y necesidades sociales, como surgió en el ámbito de hostigamiento sexual.[17] El acercamiento contrario resulta limitante al rol protector de nuestra legislación laboral.

Nuestro rol nos exige ser consecuentes, pues anteriormente hemos expresado que al interpretar el alcance de la citada Ley Núm. 100 deben tomarse en consideración los valores sociales y económicos recogidos en la legislación laboral; "esto es, proteger a la masa trabajadora contra el discrimen en el empleo y en el

---

[17]"En buena teoría de adjudicación, además, los parlamentos no son los únicos agentes de cambios sociales necesarios. Cuando se trata de mantener vivo un esquema constitucional, de conservarlo en buena sintonía con las realidades del país, es principal deber de la judicatura propender igualmente a tal fin, aunque con la mesura y circunspección que le impone su papel dentro de nuestro sistema de gobierno y sin exceder el marco de sus atribuciones. Figueroa Ferrer v. E.L.A., 107 DPR 250, 278 (1978).

reclutamiento, interpretando siempre tales estatutos de la manera más favorable al empleado víctima de actuaciones discriminatorias e injustificadas". <u>Díaz v. Wyndham Hotel Corp.</u>, supra, págs. 381-82.

No reconocer la realidad social de que el estatus migratorio de una persona es uno de los pilares del debate discriminatorio actual en nuestra sociedad sencillamente es enajenarse de nuestro contexto histórico y no darle verdadero contenido al concepto constitucional de "condición social".[18] Hoy, más que nunca, era necesario brindarle contenido, expandir su alcance y, con ello, evitar dejar desprovisto al señor Jiménez, y a otras personas en circunstancias similares, de un remedio.

VI.

Por lo antes expresado, a mi juicio, procedía resolver que tanto la Constitución de Puerto Rico como su homóloga estatutaria, la Ley Núm. 100, prohíben la discriminación en el empleo fundamentada en el estatus migratorio o la

---

[18]Para fuentes secundarias que problematizan la realidad de las personas inmigrantes en nuestra sociedad refiérase a: Sheila I. Vélez Martínez, <u>Desde Quisqueya Hacia Borinquena: Experiences and Visibility of Immigrant Dominican Women in Puerto Rico: Violence, Lucha and Hope in Their Own Voices</u>, 18 ILSA J. Int'l & Comp. L. 683, 697 (2012); Alma Pierina Rosignoli Umaña, <u>La Dignidad Del Inmigrante Violentada Por Su Exclusión Del Sufragio Y Discriminación Por Su Origen O Condición Social</u>, 51 Rev. Jur. U.I.P.R. 411, 412 (2017); Jorge Duany, <u>La Racialización De La Etnicidad En El Caribe Hispanoparlante: Haitianos En República Dominicana Y Dominicanos En Puerto Rico</u>, 46 Rev. Jur. U.I.P.R. 739 (2012).

condición de extranjería de una persona como corolario del concepto amplio constitucional de discrimen por condición social.[19] A fin de cuentas, el discrimen por condición social está intrínsicamente ligado a la protección del discrimen por motivo de origen social, entiéndase, el discriminar a una persona por el lugar de procedencia o del medio económico y social en que nació. E.J. Rivera Juanatey, supra, pág. 599.

Lastimosamente, el resultado mayoritario permitirá que situaciones como las del señor Jiménez se repitan sin que algo en nuestro ordenamiento les proscriba a los patronos el discriminar por la condición social de su estatus migratorio, y sin que la persona afectada tenga un mecanismo efectivo para reparar el agravio **en nuestros tribunales**. Todo ello, sin duda alguna, no solamente afecta adversamente las oportunidades de empleo de las personas igualmente situadas al señor Jiménez, sino que, además, contraviene la esencia de nuestra Carta de Derechos, pues, el discrimen hiere el respeto a la dignidad humana y trastoca la igualdad esencial de todas

---

[19] "La raíz constitucional de la Ley Núm. 100 exige, como mínimo, interpretar y aplicar dicho estatuto con una fuerza superior a otros estatutos ordinarios, por verse a través del prisma de la Constitución…Se trata, pues, de la canalización estatutaria de un mandato constitucional". J.M. Farinacci Fernós, Igual trato por igual trabajo: Las clasificaciones laborales irracionales y el trato desigual en el empleo privado, supra, pág. 324.

las personas dentro de nuestro sistema constitucional.[20]

Por todos estos fundamentos, respetuosamente **disiento**.


                              Luis F. Estrella Martínez
                                   Juez Asociado

---

[20]Ciertamente, "el forastero que reside lícitamente en cualquier lugar de Estados Unidos tiene derecho a las libertades de expresión, a la libertad de culto, a la libertad de asociación, al debido proceso de ley, **a la igual protección de las leyes**, a las garantías procesales fundamentales en favor de los acusados **y a otros derechos de igual jerarquía**. Véanse: L.H. Tribe, American Constitutional Law, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 360; Treatise on Constitutional Law, supra, pág. 210 citado en Ramirez de Ferrer v. Mari Bras, 144 DPR 141, 177 (1997).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Roberto Jiménez Soto y otros

    Recurridos

      v.                         CC-2023-0733   *Certiorari*

Carolina Catering Corp. h/n/c
Sky Caterers; Management
Group Investors, LLC

    Peticionarios

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 14 de enero de 2025.

Por considerar que aquellas disposiciones de la Ley Núm. 100 de 30 de junio de 1959, *infra*, que protegen a nuestros obreros y obreras de discrimen en el empleo por razón de *origen o condición social*, u *origen nacional*, incluyen todo cuestionamiento relacionado al estatus migratorio de éstos o éstas, respetuosamente disentimos del curso de acción seguido por una mayoría de este Tribunal en el caso de marras. **Y es que el discrimen por razón de extranjería implica necesariamente discriminar por razón de *origen o condición social*, u *origen nacional*.** Nos explicamos.

I.

Los hechos medulares que dan margen al presente

litigio no están en controversia. En síntesis, el 25 de febrero de 2020 el Sr. Roberto Jiménez Soto, la Sra. Diana Morales y la Sociedad Legal de Bienes Gananciales compuesta por ambos (en adelante y en conjunto, "señor Jiménez Soto") presentaron, ante el Tribunal de Primera Instancia, cierta *Demanda* por despido injustificado en contra de Carolina Catering Corp. h/n/c Sky Caterers y Management Group Investors, LLC (en adelante, "Sky Caterers"), al amparo de la Ley Núm. 100 de 30 de junio de 1959, también conocida como la *Ley contra el discrimen en el empleo*, *infra* (en adelante, "Ley Núm. 100"). En esencia, el señor Jiménez Soto, ciudadano de la República Dominicana y **residente legal permanente de los Estados Unidos de América**, adujo que Sky Caterers lo despidió discriminatoriamente de su empleo por razón de su origen o condición social, al ser percibido y tratado como un inmigrante ilegal.

En específico, el señor Jiménez Soto argumentó que Sky Caterers conocía su origen nacional cuando fue contratado el 30 de junio de 2018 y que, además, estaba al tanto de que su tarjeta de residencia permanente (*Green Card*) expiraba el 17 de julio de 2018. No obstante, indicó que dicha compañía lo despidió, efectivo el 18 de julio de 2018, por entender que no estaba autorizado a trabajar en los Estados Unidos o sus territorios.

Asimismo, el señor Jiménez Soto alegó que Sky Caterers no le brindó la oportunidad de contactar a las agencias federales correspondientes, ni le proveyó las instrucciones

escritas sobre cómo proceder bajo el supuesto de que no se pudiera confirmar su elegibilidad para trabajar. Tal proceder, a su juicio, era contrario a las propias normas de la referida compañía.

Enterada de lo anterior, el 15 de julio de 2020 Sky Caterers presentó ante el foro primario su *Contestación a la demanda*. En ésta, dicha compañía negó las alegaciones en su contra y adujo que despidió al señor Jiménez Soto porque éste no contaba con la autorización necesaria para entrar a su área de trabajo en el Aeropuerto Internacional Luis Muñoz Marín.

Sobre esto, Sky Caterers argumentó que la compañía administradora del aeropuerto, Aerostar Airport Holdings, LLC (en adelante, "Aerostar"), requería que el trabajador presentara su tarjeta de residencia renovada para poder brindarle la identificación correspondiente. En ese sentido, dicha compañía alegó que no hubo ánimo discriminatorio en el despido.

Así las cosas, y luego de varios trámites procesales no necesarios aquí pormenorizar, el 10 de febrero de 2021 Sky Caterers presentó ante el Tribunal de Primera Instancia una *Moción de sentencia sumaria*. En ésta, dicha compañía señaló que, en lo relacionado al presente caso, no existían hechos medulares en controversia y que la *Demanda* entablada por el señor Jiménez Soto no procedía como cuestión de derecho, debido a que no se había logrado demostrar un caso *prima*

*facie* de discrimen, razón por la cual procedía dictar sentencia sumaria a su favor.

En la alternativa, Sky Caterers argumentó que, del foro primario entender que se estableció un caso *prima facie* de discrimen, el despido del señor Jiménez Soto estaba justificado puesto que la tarjeta residencial de éste había expirado y la legislación federal prohibía retener en el empleo a un extranjero sin autorización para trabajar en los Estados Unidos. Asimismo, dicha compañía aseveró que contrató al señor Jiménez Soto sin tomar en cuenta su nacionalidad, y reiteró que éste rechazó la oferta que se le extendió para ser reinstalado a su puesto, una vez renovara su tarjeta de residencia.

En respuesta, el 8 de marzo de 2021 el señor Jiménez Soto presentó ante el Tribunal de Primera Instancia una *Oposición a moción de sentencia sumaria y solicitud de sentencia sumaria a favor de la parte demandante*. Mediante dicha moción, éste planteó que su despido estaba relacionado directamente a su origen nacional y estatus de ciudadanía, y que, independientemente de que su tarjeta de residencia expirara, **siempre conservó la autorización para trabajar en Puerto Rico por ser un residente legal permanente**. Así pues, sostuvo que Sky Caterers no estableció una razón legítima para justificar su despido.

De igual forma, el señor Jiménez Soto alegó que la prueba del discrimen presentada era directa, por lo que el esquema probatorio para establecer un caso *prima facie* de discrimen

no aplicaba. En la alternativa, sostuvo que dicha evidencia era suficiente para demostrar un caso *prima facie* de discrimen por razón de origen nacional y estatus de ciudadanía, toda vez que Sky Caterers no lo hubiese despedido si su tarjeta de residencia permanente no hubiera expirado. Por tal razón, solicitó que se dictara sentencia sumaria a su favor, y en contra de la referida compañía.

Evaluado lo solicitado por ambas partes, el 2 de mayo de 2023 el foro primario emitió una *Sentencia parcial*. **En la misma, determinó que Sky Caterers, al despedir al señor Jiménez Soto, discriminó en su contra por razón de su origen nacional, toda vez que, aunque su tarjeta de residencia permanente estaba expirada, su estatus de residencia y autorización para trabajar se mantuvieron vigentes**. A juicio del Tribunal de Primera Instancia, al referido trabajador no se le hubiera requerido renovar innecesariamente un documento de no haber sido por el origen nacional y el estatus migratorio que poseía.

De conformidad con ello, el foro primario procedió a aplicar el esquema probatorio desarrollado en *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973), para casos de discrimen. Al respecto, concluyó que el señor Jiménez Soto estableció un caso *prima facie* de discrimen y que Sky Caterers no logró rebatir la presunción, puesto que las razones ofrecidas por esta última para el despido eran improcedentes en derecho.

En consecuencia, el Tribunal de Primera Instancia declaró con lugar la solicitud de sentencia sumaria presentada por el señor Jiménez Soto. A su vez, ordenó la continuación de los procedimientos para que se presentara prueba sobre los daños alegados.

Inconforme con lo sentenciado por el foro primario, el 18 de mayo de 2023 Sky Caterers presentó una *Moción de reconsideración* ante dicho tribunal, mediante la cual reiteró que conocía del origen nacional del señor Jiménez Soto al momento de su contratación y que la compañía administradora del aeropuerto, -- Aerostar --, fue la que requirió la renovación de la tarjeta de residencia para producir la identificación del acceso aeroportuario. Sin embargo, el Tribunal de Primera Instancia declaró no ha lugar la misma.

En desacuerdo todavía con lo resuelto por el foro primario, el 10 de julio de 2023 Sky Caterers presentó un *Recurso de apelación* ante el Tribunal de Apelaciones. En síntesis, dicha parte argumentó que, en el caso de marras, no se había logrado establecer un caso *prima facie* de discrimen de acuerdo con el esquema probatorio formulado en *McDonnell Douglas Corp. v. Green*, *supra*, y que la conclusión de que hubo discrimen a la que arribó el foro primario era especulativa.

Por su parte, el 21 de agosto de 2023 el señor Jiménez Soto presentó un *Alegato en oposición al recurso de apelación*. En el mismo, éste reiteró los argumentos presentados ante el Tribunal de Primera Instancia.

Examinados los alegatos de ambas partes, el 11 de octubre de 2023 el foro apelativo intermedio emitió una *Sentencia*. Mediante la misma, el Tribunal de Apelaciones confirmó la determinación del Tribunal de Primera Instancia.

**En esencia, el foro apelativo intermedio concluyó que requerir la presentación de una tarjeta de residencia vigente, sin corroborar si ante la expiración de ésta el estado de elegibilidad para trabajar del señor Jiménez Soto había cambiado, constituía una actuación incorrecta por parte de Sky Caterers.** Lo anterior, pues según el formulario federal *Verificación de elegibilidad de empleo* (Formulario I-9), no se podía especificar el tipo de documento que el trabajador debía presentar para evidenciar su autorización para trabajar. Esto, a juicio del Tribunal de Apelaciones, demostraba un ánimo discriminatorio.

Asimismo, el foro apelativo intermedio señaló que un residente permanente cuya tarjeta de residencia permanente expiró no queda, por esto, desautorizado para trabajar. Tal hecho, según su razonamiento, demostraba que en este caso la decisión del despido estuvo basada exclusivamente en motivos discriminatorios.

En desacuerdo con el proceder del Tribunal de Apelaciones, el 10 de noviembre de 2023 Sky Caterers presentó ante este Tribunal una *Petición de certiorari*. En suma, dicha parte plantea que el foro apelativo intermedio había errado al confirmar la sentencia del Tribunal de Primera Instancia y, por consiguiente, al determinar que el señor Jiménez Soto

había cumplido con establecer un caso *prima facie* de discrimen.

En su recurso, dicha compañía reitera que contrató al señor Jiménez Soto a sabiendas de su nacionalidad. Asimismo, Sky Caterers sostiene que fueron las exigencias de Aerostar, -- de no expedir la identificación que le permitiera al mencionado trabajador la entrada al aeropuerto --, las que provocaron que dicha compañía tuviese que despedirle.

Por su parte, el 24 de abril de 2024 el señor Jiménez Soto presentó su *Alegato en oposición a petición de certiorari*. En dicho escrito, éste, en esencia, argumenta que la prueba del discrimen que presentó ante el foro primario es directa y, por tanto, no es de aplicación el esquema probatorio para establecer un caso *prima facie* de discrimen.

De igual forma, el señor Jiménez Soto aduce que Sky Caterers no logró probar que lo despidió por una razón independiente a su origen nacional o estatus migratorio, puesto que esta última ha afirmado que dicha actuación respondió a la expiración de su tarjeta de residencia permanente. En la alternativa, alega que los foros inferiores determinaron que hubo discrimen al aplicar el esquema probatorio, por lo que el resultado sería el mismo.

Expedido el auto y examinados los argumentos de ambas partes, una mayoría de esta Curia ha optado por, en escenarios como estos, dejar desprovisto al señor Jiménez Soto y a la clase trabajadora inmigrante de Puerto Rico de remedio alguno, al adoptar un precedente federal que se aleja de los

preceptos constitucionales más fundamentales de nuestro País: el derecho a la inviolabilidad de la dignidad humana y la prohibición de discrimen. Olvidan, consciente o inconscientemente, que estos principios cobijan a toda persona en Puerto Rico, independientemente del lugar de su nacimiento y todo lo que tal condición acarrea.

La determinación de mi compañera y compañeros de estrado, -- la cual en esencia establece que el discrimen por razón de ciudadanía o estatus migratorio no está prohibido por la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, ni por la Ley Núm. 100, *infra*, --, también pasa por alto la importancia del derecho al trabajo en nuestra sociedad y, a su vez, perpetúa la desigualdad que, en beneficio del patrono, caracteriza la relación obrero-patronal.

Con tal decisión, obviamente, no podemos estar de acuerdo. Procedamos, pues, a esbozar nuestros fundamentos para disentir de dicho proceder.

II.

A.

Como es sabido, en innumerables ocasiones, este Tribunal ha sentenciado que la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico es un documento de avanzada. *Pueblo v. Martínez Cruz*, 2006 TSPR 74, 12 (2006); *Mun. de Ponce v. A.C. et al.*, 153 DPR 1, 102 (2001); *Pueblo v. Santiago Feliciano,* 139 DPR 361, 436 (1995) (Rebollo López, opinión disidente); *ELA v. Hermandad de Empleados*, 104

DPR 436, 440 (1975). Y es que ésta, además de ampliar los derechos tradicionales, reconoció una serie de derechos económicos y sociales inspirados en la Declaración Universal de los Derechos del Hombre y en la Declaración Americana de los Derechos y Deberes del Hombre. *Garib Bazain v. Hospital Español Auxilio Mutuo de Puerto Rico,* 204 DPR 601, 627 (2020) (Oronoz Rodríguez, opinión disidente); *García v. Aljoma,* 162 DPR 572, 580-581 (2004); *Arroyo v. Rattan Specialties, Inc.*, 117 DPR 35, 60 (1986).

En esa dirección, nuestra Carta de Derechos comienza por establecer que, en esta jurisdicción, la dignidad del ser humano es inviolable. Art II, Sec. 1, Const. PR, LPRA, Tomo 1. Implicando con ello que, bajo el ordenamiento jurídico de Puerto Rico, está prohibido, -- de forma categórica --, cualquier quebrantamiento del valor y respeto que se merece toda persona por el simple hecho de ser humana. J. Farinacci Fernós, *La carta de derechos*, San Juan, Editorial InterJuris, 2021, pág. 20. Así pues, se ha reconocido que el derecho a la dignidad es, a todas luces, irrenunciable. C. E. Ramos González, *La inviolabilidad de la dignidad humana: lo indigno de la búsqueda de expectativas razonables de intimidad en el derecho constitucional puertorriqueño*, 45 Rev. Jur. U.I.P.R. 185, 187 (2011). Véase también, *RPR & BJJ Ex parte*, 207 DPR 389, 440 (2021) (Oronoz Rodríguez, opinión de conformidad).

Sobre el particular, y según revela el Diario de Sesiones de la Convención Constituyente, la y los delegados a dicho proceso visualizaron la dignidad humana como "la

piedra angular y básica de la democracia". Diario de Sesiones de la Convención Constituyente 1342 (1952) (versión digital). En consonancia con tales expresiones, hemos señalado que la dignidad y su inviolabilidad son el pilar que sirve de base a todos los demás derechos que se consagran en la Constitución del Estado Libre Asociado de Puerto Rico. *Garib Bazain v. Hospital Español Auxilio Mutuo de Puerto Rico*, *supra*, pág. 629 (Oronoz Rodríguez, opinión disidente); *Berberena v. Echegoyen*, 128 DPR 864, 916 (1991) (Rebollo López, opinión disidente).

### B.

Como corolario de la inviolabilidad de la dignidad humana y su evidente supremacía, nuestra Carta Magna prohíbe el discrimen por motivo de raza, color, sexo, nacimiento, **origen o condición social**, y por ideas políticas o religiosas. Art. II, Sec. 1, Const. PR, LPRA, Tomo 1. **En otras palabras, esta parte de la Sección 1 de nuestra Carta de Derechos "establece una prohibición categórica contra el discrimen por clasificaciones que responden a prejuicios e instancias históricas de opresión o marginación".** (Énfasis suplido). Farinacci Fernós, *op. cit.*, pág. 60.

En lo que a la clasificación de **origen o condición social** se refiere,[1] en el pasado hemos expresado que ésta "se

---

[1] Cabe destacar que no nos adentramos en la cláusula de *nacimiento*, pues el Diario de Sesiones de la Convención Constituyente refleja que ésta iba dirigida, en esencia, a atender el discrimen que surge a raíz del estado civil de los progenitores de una persona. *Véase*, Diario de Sesiones de la Convención Constituyente 3176 (1952) (versión digital) y J. Farinacci Fernós, *La carta de derechos*, San Juan, Editorial InterJuris, 2021, págs. 41-45.

manifiesta a través de dos vertientes: (1) aquella que prohíbe el prejuicio contra cualquier persona **por su origen o estatus económico**, y (2) aquella que prohíbe el discrimen por condición social, entiéndase, **el status del individuo en la comunidad**". (Énfasis en original omitido). *Garib Bazain v. Hosp. Español Auxilio Mutuo de Puerto Rico*, *supra*, pág. 687 (Colón Pérez, opinión disidente). En otras palabras, el discrimen por *origen o condición social* incluye tanto aspectos económicos como sociales. *Íd*. Véase también *Pérez, Román v. Proc. Esp. Rel. de Fam.*, 148 DPR 201, 214 (1999).

En cuanto al concepto de *origen social* en particular, se ha teorizado que el mismo abarca las características materiales y subjetivas que rodean nuestro nacimiento y crianza. Farinacci Fernós, *op. cit.,* pág. 45. Es decir, éste se refiere a las circunstancias del pasado de una persona, particularmente aquellas relacionadas al ámbito material y/o económico. *Íd*. pág. 53. A su vez, incluye las valorizaciones de la sociedad sobre dichas circunstancias. *Íd.* Así pues, y a modo de ejemplo, en virtud de esta cláusula se prohíbe discriminar por asuntos tales como el hecho de que una persona haya nacido en un lugar pobre o rico, o por razón de que su familia tuviere pocos o muchos recursos económicos. J. R. Roqué Velásquez*, Apuntes hacia una definición del discrimen por "origen o condición social" en Puerto Rico,* 39 Rev. Jur. UIPR 183, 188 (2004).

Por otro lado, respecto al término de *condición social*, se ha razonado que éste comprende aquellas circunstancias,

estigmas y prejuicios que se adquieren a lo largo de la vida de la persona. Farinacci Fernós, *op. cit.*, pág. 53. Por tanto, el concepto de condición social es una extensión del término de origen social; la distinción entre ambos radica en el momento en que la persona adquiere la circunstancia particular en cuestión. *Íd.*

**Ahora bien, dicho ello, debemos tener en consideración que, para que determinada circunstancia esté constitucionalmente protegida por la cláusula de *origen o condición social*, es necesario que la misma sea producto de una marcada tendencia social a marginar a quienes presenten dicha circunstancia.** *Rosario v. Toyota*, 166 DPR 1, 21 (2005) (Rebollo López, opinión de conformidad) (Sentencia). **Puesto de otra forma, no toda circunstancia o característica asociada al aspecto social o económico de una persona estará cobijada bajo esta garantía, sino aquella que generalmente es utilizada por nuestra sociedad como fundamento para marginar.**

En síntesis, la prohibición constitucional del discrimen *por origen o condición social* implica que todas las personas en Puerto Rico son iguales ante la ley; esto, sin importar su extracción, situación económica o su condición en la comunidad. *Pérez, Román v. Proc. Esp. Rel. de Fam.*, *supra*, págs. 213-214; Diario de Sesiones de la Convención Constituyente 1675 (1952) (versión digital). Y es que, no debe haber duda de que, bajo nuestro ordenamiento jurídico, "la igualdad ante la ley queda por encima de accidentes o

diferencias, bien tenga su origen en la naturaleza o en la cultura". *Rosario v. Toyota*, *supra*, pág. 13 (Rebollo López, opinión de conformidad) (Sentencia).

**Así las cosas, para poder determinar si cierta circunstancia está, o no, protegida por la cláusula de *origen o condición social* incluida en la Constitución del Estado Libre Asociado de Puerto Rico, es necesario que: (1) la circunstancia en particular esté asociada al entorno social o económico de la persona, -- ya sea por los azares de la naturaleza o por el desarrollo de la persona en la sociedad --, y (2) exista una marcada tendencia social a marginar a quienes presenten dicha circunstancia. En ese sentido, somos del criterio que el derecho esbozado evidencia que la cláusula de *origen o condición social* puede ser interpretada de forma tal que abarque aquellas instancias en las que se discrimina a una persona por razón de su nacionalidad o condición de extranjería.**

Recordemos que, en nuestra sociedad, la nacionalidad está ineludiblemente ligada al ámbito social, -- y, en algunos casos, al ámbito económico --, de una persona. Tal condición acarrea, de ordinario, características culturales, lingüísticas y físicas, las que, a su vez, podrían suscitar un trato distinto por parte de personas que no forman parte de dicha población. No obstante, y según mencionamos, tendría que evidenciarse una marcada tendencia a marginar contra ese sector.

C.

Como si lo anterior no fuese suficiente, tanto este Tribunal, como personas estudiosas del tema, hemos reconocido la no taxatividad de las instancias de discrimen vedadas por la referida Sección 1 de nuestra Carta de Derechos. Farinacci Fernós, *op. cit.*, pág. 51. *Santini Rivera v. Serv. Air, Inc.*, 137 DPR 1, 13 (1994); *De Paz Lisk v. Aponte Roque*, 124 DPR 472 (1989); *Wackenhut Corp. v. Rodríguez Aponte*, 100 DPR 518 (1972). Es decir, las instancias o cláusulas señaladas constituyen meramente un mínimo. *Íd.*

De conformidad con ello, en *Wackenhut Corp. v. Rodríguez Aponte*, *supra*, esta Curia reconoció el discrimen por razón de nacionalidad como uno de los que expresamente prohíbe el Art. II, Sec. 1 de nuestra Constitución. *De Paz Lisk v. Aponte Roque*, *supra*, págs. 485-486. Ésta, al igual que las demás clasificaciones incluidas en la referida disposición constitucional, es tangente con la dignidad del ser humano y con el principio de igualdad ante la ley. *Wackenhut Corp. v. Rodríguez Aponte*, *supra*, pág. 531. Véase también, *Rodríguez Rodríguez v. Estado Libre Asociado de Puerto Rico*, 130 DPR 562, 582 (1992); *Calo Morales v. Cartagena Calo*, 129 DPR 102, 132 (1991)

D.

De otra parte, y por considerarlo en extremo pertinente para la correcta y completa disposición de los asuntos ante nuestra consideración, conviene señalar aquí que, la referida protección constitucional contra el discrimen por razón de *origen o condición social*, y por *nacionalidad*, no solo fue

reconocida por la y los delegados a la Convención Constituyente y por este Tribunal, sino que también, en el ejercicio de legislar, ha sido reconocida en innumerables ocasiones por nuestra Asamblea Legislativa. En lo relacionado a las controversias que nos ocupan, fue la Ley Núm. 100, 29 LPRA sec. 146, *et seq.*, el estatuto que, precisamente, extendió dicha garantía al ámbito obrero-patronal.

En particular, el Art. 1 de la Ley Núm. 100, *infra*, establece una causa de acción contra todo patrono que despida, suspenda o discrimine contra un empleado suyo por razón de: (1) edad, (2) raza, (3) color, (4) sexo, (5) orientación sexual, (6) identidad de género, **(7) origen social, (8) origen nacional, (9) condición social**, (10) afiliación política, (11) ideas políticas, (12) ideas religiosas, (13) por ser víctima de o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, y/o (14) por ser militar, ex militar, servir o haber servido en las Fuerzas Armadas de los Estados Unidos o por ostentar la condición de veterano del empleado o solicitante de empleo. 29 LPRA sec. 146.

De conformidad con lo dispuesto en la precitada disposición legal, el patrono que realice alguna de estas acciones incurrirá en responsabilidad civil por: (1) una suma igual al doble del importe de los daños que el acto haya causado al empleado o solicitante de empleo; (2) una suma no menor de quinientos dólares ($500) ni mayor de dos mil dólares ($2,000), a discreción del tribunal, si no se pudieren

determinar daños pecuniarios; o por (3) el doble de la cantidad de los daños ocasionados, si ésta fuere inferior a la suma de quinientos dólares ($500). *Íd.*, inciso (a). De igual forma, incurrirá en un delito menos grave y, de ser convicto, será castigado con multa de hasta cinco mil dólares ($5,000), o cárcel por un término no mayor de noventa (90) días, o ambas penas, a discreción del tribunal. *Íd.*, inciso (b).

Cabe mencionar que el Art. 6 de la Ley Núm. 100, *supra*, define varios conceptos tales como *edad*, *patrono* e *identidad de género*. 29 LPRA sec. 151. No obstante, no se provee definición para los términos de *origen social*, *origen nacional* y *condición social*. Ante el silencio que guarda el estatuto al respecto, es imperativo acudir a las reglas de hermenéutica pertinentes.

E.

En esa dirección, debemos tener presente, primero, que la Ley Núm. 100, *supra*, -- al igual que otras leyes laborales --, debe ser interpretada liberalmente para conceder a las y los trabajadores la mayor protección de los derechos. *Cordero Jiménez v. UPR*, 188 DPR 129, 139 (2013); *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, *supra*, pág. 363; *Arce Bucetta v. Motorola*, 173 DPR 516, 551 (2008). Lo anterior, debido a que este tipo de estatutos tiene fines reparadores y sociales. *Íd*.

En segundo lugar, y como se ha expresado en otras ocasiones, **el análisis en torno al alcance de este estatuto**

**"debe considerarse análogo al de la cláusula constitucional en cuestión"**. *Garib Bazain v. Hosp. Español Auxilio Mutuo de Puerto Rico*, *supra*, pág. 688 (Colón Pérez, opinión disidente). Esto es así toda vez que fue en dicha cláusula constitucional que se inspiró la prohibición de discrimen de la Ley Núm. 100, *supra*.[2]

Por último, es importante mencionar que la Ley Núm. 4-2017, también conocida como la *Ley de transformación y flexibilidad laboral*, 29 LPRA sec. 121 *et seq.* (en adelante, "Reforma Laboral") introdujo varios cambios al Derecho Laboral puertorriqueño. En lo que nos atañe, el Art. 6.2 de la Reforma Laboral, *infra*, dicta que:

> Al aplicarse las disposiciones de cualquier ley de discrimen o represalia en el empleo, se reconocerá lo dispuesto en la legislación y reglamentación federal, al igual que las interpretaciones judiciales de las mismas de aquellos tribunales con jurisdicción en Puerto Rico, a los fines de asegurar interpretaciones consistentes en cuanto a términos o disposiciones similares, **salvo que las disposiciones de la legislación local requieran una interpretación distinta.** (Énfasis suplido). 29 LPRA sec. 123a.

En otras palabras, dicho artículo implementó una regla de hermenéutica para estatutos laborales. En esencia, se nos dirige a acudir a lo establecido mediante legislación, reglamentación y jurisprudencia federal. Ello, y como enfatizamos, salvo que las disposiciones de la legislación local requieran una interpretación distinta.

---

[2] El concepto de *origen nacional* fue incluido en la Ley Núm. 100, *supra*, mediante la Ley Núm. 67 de 3 de junio de 1983. Surge de la Exposición de motivos de dicho estatuto que la Asamblea Legislativa tenía la intención de equiparar la Ley Núm. 100, *supra*, con el Título VII de la Ley Federal de Derechos Civiles de 1964, 42 USC sec. 2000e-1 *et seq.*

F.

En virtud de esta última regla de interpretación, es importante mencionar que el Título VII de la Ley de Derechos Civiles de 1964, *infra*, es el estatuto federal que prohíbe que un patrono discrimine contra un trabajador por razón de raza, color, religión, sexo u **origen nacional**. 42 USC sec. 2000e-2(a)1. En cuanto a la definición de *origen nacional*, y en lo pertinente a la controversia ante nos, para 1973 el Tribunal Supremo de los Estados Unidos resolvió el caso de *Espinoza v. Farah Mfg. Co.*, 414 US 86 (1973), el cual es mandatario aquí repasar.

En dicho caso, el máximo foro judicial federal determinó que la discriminación por razón de ciudadanía o estatus migratorio no estaba prohibida por el Título VII de la Ley de Derechos Civiles de 1964, *supra*. A pesar de reconocer que en muchas instancias discriminar a base de ciudadanía o estatus migratorio implica discriminar por razón de origen nacional,[3] el referido tribunal optó por adoptar una visión más limitada de este último concepto. *Íd.*, págs. 92 y 95.

Según el análisis del Tribunal Supremo federal, el concepto de origen nacional no abarca el concepto de ciudadanía. *Íd.*, pág. 89. Más bien, origen nacional meramente se refiere al país en el cual una persona nació o del cual provienen sus ancestros. *Íd.*, pág. 88. En esa dirección, el

---

[3] En particular, dicho foro dispuso que utilizar la ciudadanía como un pretexto para discriminar por razón origen nacional constituye una violación al Título VII de la Ley de Derechos Civiles de 1964, *supra*. *Espinoza v. Farah Mfg. Co.*, 414 US 86, 92 (1973).

foro federal destacó, a modo de ejemplo, que sería ilegal contratar a personas de trasfondo anglosajón, pero negarse a contratar aquellas de linaje mexicano o español. *Íd.*, pág. 95.

**Cabe mencionar que, en esa ocasión, el Juez Asociado Douglas disintió. Éste resaltó que la extranjería proviene de una sola condición: el haber nacido fuera de los Estados Unidos.** *Íd.*, pág. 96 (Douglas, opinión disidente). **A su entender, la norma impugnada era, en efecto, una política que le otorgaba preferencia a las personas nacidas en dicho país.** *Íd.* (Douglas, opinión disidente). **Así pues, concluyó que el discrimen por razón de extranjería implicaba necesariamente discriminar por razón de origen nacional.** *Íd.*, pág. 97 (Douglas, opinión disidente).

Como hemos adelantado, la determinación de *Espinoza v. Farah Mfg. Co., supra*, no nos persuade. En primera instancia, el máximo foro judicial federal reconoció que el historial legislativo del Título VII de la Ley de Derechos Civiles de 1964, *supra*, poco abunda respecto a la definición de *origen nacional*. *Íd.*, págs. 88-89.

Lo anterior es cónsono con el momento histórico en que se aprobó el referido estatuto y en el que se decidió el caso en cuestión. Para esas fechas, los temas de discriminación laboral se centraban en la discriminación por razón de raza o color, mientras que la discriminación contra latinos y otros tipos de inmigrantes, -- por estatus migratorio y/u otras características asociadas a la condición de extranjería

--, no era el asunto prioritario, ni mayor estudiado. M. L. Ontiveros, *Immigrant workers and workplace discrimination: Overturning the missed opportunity of Title VII under Espinoza v. Farah*, 39 Berkeley J. Emp. & Lab. L. 117, 134 (2018); S. M. Heneghan, *Employment discrimination faced by the Immigrant Worker: A lesson from the United States and South Africa*, 35 Fordham Int'l L.J. 1780, 1818 (2012); J. F. Perea, *Ethnicity and prejudice: reevaluating "national origin" discrimination under Title VII*, 35 Wm. & Mary L. Rev. 805, 810-818 (1994).

**En segundo lugar, y aún más importante, nuestra Carta de Derechos nos permite adoptar una visión más protectora de los derechos de la clase trabajadora.[4] A pesar de que, como mencionamos, la Reforma Laboral, *supra*, establece que, al aplicarse las disposiciones de cualquier ley de discrimen o represalia en el empleo debemos reconocer lo decretado a nivel federal, lo anterior no aplica cuando la legislación local requiera una interpretación distinta, y, más aún, cuando nuestra Constitución, -- frente esencial de derechos y libertades --, nos llama a ampliar sus protecciones. Entendemos que estamos ante una de esas instancias.**

---

[4] Cabe aquí recordar nuestras expresiones en *Whittenburg v. Col. Ntra. Sra. Del Carmen*, 182 DPR 937, 939 (2011):

> No hay más que repasar nuestra Constitución para advertir la importancia del derecho al trabajo en nuestra sociedad, reconocimiento que surge del valor social del trabajo como elemento central de la vida en sociedad. Esta realidad no solo la reconoció la Convención Constituyente sino que ha sido objeto de actuaciones legislativas a través de los años que han resultado en una política pública laboral que claramente protege los derechos de los trabajadores contra el capricho y abuso patronal.

Recordemos, nuevamente, que nuestra Constitución, a diferencia de la Constitución de los Estados Unidos, reconoce expresamente el derecho a la inviolabilidad humana y prohíbe el discrimen, entre otras razones, por *origen o condición social* y, mediante jurisprudencia, por *nacionalidad.* Dichas disposiciones constitucionales sirvieron de base para lo establecido en la Ley Núm. 100, *supra*. Ante ello, no vemos impedimento alguno para interpretar este estatuto de forma más abarcadora y, por tanto, otorgar una mayor protección a la clase trabajadora de Puerto Rico.

**Al igual que el Juez Asociado Douglas, somos de la opinión que la extranjería está inevitablemente atada al concepto de *origen nacional*. En pocas palabras, el discrimen por razón de *origen nacional*, -- discrimen por todo aquello que acarrea ser una persona extranjera --, puede experimentarse, independientemente del estatus migratorio de la víctima.[5]**

---

[5] Ello fue precisamente uno de los planteamientos de la comunidad Mexicoamericana implicada en el caso de *Espinoza v. Farah Mfg. Co., supra*:

> The employees at Farah and the Latino community recognized this discrimination as the same pattern of discrimination they experienced as Mexican-Americans, regardless of their citizenship status. Most of the workers lived in the Segundo or Second Ward, an impoverished barrio in south El Paso near the Mexican border. Regardless of their citizenship status, they had a strong Mexican identity because of their close geographic and social connection to Mexico. More importantly, they were viewed by the community as "Mexicans" and stigmatized as "aliens," regardless of whether they were naturalized citizens, had been born in Texas, or had family roots in the area going back for centuries. Within the factory walls, they referred to the excessive control and surveillance as similar to the patron system, a feudal system used in Mexico. The Farah supervisors intentionally used power dynamics, grounded in gender and ethnic characteristics, to humiliate, control and harass the female workers. Workers at Farah and Latino members of the Texas communities experienced discrimination based on a

G.

Por último, en lo referente a los asuntos aquí bajo estudio, debemos repasar brevemente el esquema probatorio para casos de discrimen laboral. Al respecto, es importante mencionar que el Art. 3 de la Ley Núm. 100, *supra*, establecía una presunción de discrimen a favor de la trabajadora o del trabajador.

En particular, el mencionado artículo disponía lo siguiente: "Se presumirá que cualquiera de los actos mencionados en las secciones precedentes fueron cometidos en violación de esta ley, cuando los mismos hayan sido realizados sin justa causa. Esta presunción será de carácter controvertible". Ley Núm. 100, 29 LPRA sec. 148 (2016) (derogada). En otras palabras, se presumía que los actos discriminatorios regulados por dicho estatuto eran realizados sin justa causa, por lo que el patrono tenía el peso de producir la prueba y persuadir al tribunal de lo contrario. Véase, *Arce v. Martínez*, 146 DPR 215, 231-232 (1998); *Ibáñez v. Molinos de PR, Inc.*, 114 DPR 42, 51-52 (1983).

No obstante, con la aprobación de la Reforma Laboral, *supra*, dicha disposición fue eliminada. De conformidad con este cambio, se ha argumentado que la referida presunción también fue descartada, equiparando la forma de probar los

---

combination of ethnicity, national origin and immigration status that could not be disentangled. M. L. Ontiveros, *Inmigrant workers and workplace discrimination: overturning the missed opportunity of Title VII under* Espinoza v. Farah, Berkeley Journal of Employment and Labor Law, Forthcoming, Univ. of San Francisco Law Research Paper No. 2017-11, págs. 14-15.

casos de discrimen bajo la Ley Núm. 100, *supra*, a aquellos bajo la Ley de Derechos Civiles de 1964, *supra*.

En ese sentido, la normativa federal ordena evaluar, primero, si la evidencia de discrimen presentada por el trabajador o la trabajadora es directa o circunstancial. Constituye evidencia directa aquella que, de ser creída, lleva al juzgador a concluir que la discriminación ilegal fue al menos un factor motivador en la actuación del patrono. *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (1999). Cuando el juzgador determina que la evidencia presentada es, en efecto, de naturaleza directa, el peso de la prueba se desplaza al patrono, quien viene obligado a demostrar que hubiese actuado de la misma forma sin considerar la característica o condición protegida. *Íd*.

Ahora bien, y dado a que en estos casos puede ser difícil hallar evidencia directa, el Tribunal Supremo de los Estados Unidos desarrolló un esquema probatorio alterno que permite levantar una inferencia de discriminación intencional. *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (1995). Específicamente, en *McDonnell Douglas Corp. v. Green*, *supra*, dicho foro dispuso que, en ausencia de prueba directa, la trabajadora o el trabajador tiene que establecer un caso *prima facie* de discrimen. *Íd.*, pág. 802. Para ello, ésta o éste debe probar que: (1) pertenece a una clase protegida por la legislación; (2) está cualificada o cualificado para el puesto en cuestión; (3) fue objeto de una acción adversa; y que (4) hubo un trato más favorable para trabajadores en una

situación similar y no pertenecientes a la clase protegida. *Íd*. Véase también, *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220-1221 (11mo Cir. 2019).

Una vez la parte demuestra la concurrencia de estos factores, se presume que ha habido discrimen, por lo que le corresponde al patrono derrotar tal presunción mediante la presentación de evidencia que razonablemente justifique la acción adversa. *McDonnell Douglas Corp. v. Green*, *supra*, pág. 802. Es decir, debe presentar evidencia de que tuvo alguna razón legítima y no discriminatoria para actuar de tal forma.

Presentada dicha evidencia, la o el trabajador tiene una última oportunidad de convencer y persuadir al tribunal de que la razón alegada por el patrono en su defensa fue un mero pretexto detrás de su intención y ánimo de discriminar, y que realmente la actuación impugnada fue tomada por motivos exclusivamente discriminatorios. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 US 133, 143 (2000); *St. Mary´s Honor Center v. Hicks*, 509 US 502, 507-508 (1993).

Es, pues, a la luz de la normativa antes expuesta que, -- desde la disidencia --, procedemos a disponer del caso que nos ocupa.

## II.

Como mencionamos anteriormente, en el presente caso, el señor Jiménez Soto sostiene que la prueba que éste presentó ante el Tribunal de Primera Instancia, para evidenciar el discrimen en su contra por parte de Sky Caterers, es una directa, razón por la cual el esquema probatorio para

establecer un caso *prima facie* de discrimen pautado en *McDonnell Douglas Corp. v. Green*, *supra*, no es de aplicación al caso de marras. Alega, además, que dicha compañía no logró establecer que despidió a éste por una razón distinta a su estatus migratorio, pues ésta se limitó a señalar que su despido respondió a la expiración de su tarjeta de residencia permanente. Ahora bien, en la alternativa, el señor Jiménez Soto sostiene que de este Tribunal aplicar el referido esquema probatorio llegaríamos a igual resultado. Le asiste la razón.

Y es que, de conformidad con la normativa antes expuesta, somos del criterio que las cláusulas de discrimen por razón de *origen social* y *condición social* incluidas en la Ley Núm. 100, *supra*, -- las cuales emanan de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico --, comprenden la condición de nacionalidad o extranjería, incluyendo el estatus migratorio de la persona. Ello así, toda vez que, según mencionamos en la exposición del derecho que antecede: (1) la condición de extranjería tiene implicaciones de naturaleza social, y (2) no albergamos duda de que ha existido una tendencia marcada a discriminar a las personas de origen dominicano en Puerto Rico.[6]

---

[6] Al respecto, cabe mencionar que la población dominicana ha sido, por años, el grupo inmigrante más grande de Puerto Rico. Alberto L. Velázquez Estrada, *Población dominicana en Puerto Rico: características sociodemográficas y contrastes con la población puertorriqueña 2015-2019*, INSTITUTO DE ESTADÍSTICAS DE PUERTO RICO 6 (27 de abril de 2022). Según datos recopilados entre el 2015 y el 2019, el 59% de la población de Puerto Rico de origen hispano, pero no puertorriqueño, es de origen dominicano. *Íd*. De igual forma, se estima que la población dominicana en el archipiélago para el 2020 era de 55,158 personas. Ramona Hernández, Francisco L. Rivera-Batiz y Sidie S. Sisay, *Quisqueya en Borinquen: un*

De otra parte, somos también de la opinión que la cláusula de *origen nacional* incluida en la Ley Núm. 100, *supra*, comprende el concepto de estatus migratorio. Es decir, en algunos casos, discriminar por razón de estatus migratorio inevitablemente resultará en discriminar por razón de origen nacional.

Así las cosas, en el presente caso no era necesario adentrarnos en el esquema propuesto en *McDonnell Douglas Corp. v. Green*, *supra*, toda vez que bien podría concluirse que la prueba presentada por el señor Jiménez Soto constituye prueba directa de discrimen por razón de *origen o condicional social*, y de *origen nacional*. En particular, el referido

---

*perfil socioeconómico de la población dominicana en Puerto Rico*, CUNY DOMINICAN STUDIES INSTITUTE 1 (2023).

Son varios los retos a los que se enfrenta este sector. En primer lugar, se ha encontrado que el nivel de pobreza de la población dominicana es más agudo que el de la puertorriqueña. *Íd.*, pág. 23. A modo de ejemplo, para el periodo de 2016 a 2020, la tasa de pobreza entre las personas dominicanas fue de 51.4%, en comparación con el 44.4% registrado para Puerto Rico. *Íd.* Lo anterior, a pesar de que dicha población tiene tasas de participación en la fuerza laboral más altas que la población general de Puerto Rico. *Íd.*, pág. 28.

En segundo lugar, muchas de estas personas no cuentan con un estatus migratorio definido. *Estudio sobre el perfil, situación actual y aspiraciones de población dominicana en Puerto Rico*, UNITED WAY PUERTO RICO 39 (2022). Esta situación resulta en que los servicios a los que pueden tener acceso son limitados. *Íd.* Finalmente, y como corolario de todo lo anterior, también se enfrentan al discrimen. Aunque dicha problemática ha disminuido con el tiempo, las personas de origen dominicano continúan sufriendo de un trato distinto el cual se manifiesta, entre otras situaciones, en abuso por parte de las autoridades, y en la denegatoria de servicios de salud, vivienda, educativos y laborales. *Íd.*, en la pág. 42. *Véase también*, J. A. Montijo, *Los vecinos: prejuicio y discrimen en República Dominicana y Puerto Rico*, 2 Plaza Crítica 2-3(2005-2006); Sofía Rico, "Comunidades dominicanas denuncian continuo discrimen por parte de la policía", 23 de julio de 2022, *Noticel*, https://www.noticel.com/legislatura/ahora/top-stories/20220723/comunidades-dominicanas-denuncian-continuo-discrimen-por-parte-de-la-policia/; "Alertan sobre el discrimen contra dominicanos en Puerto Rico", 29 de enero de 2013, *Metro*, https://www.metro.pr/pr/mundo/2013/01/30/alertan-discrimen-contra-dominicanos-puerto-rico.html.

trabajador presentó su carta de despido, la cual disponía:
"Terminación en periodo probatorio efectivo el 7/18/2018, por
no estar autorizado a trabajar en los Estados Unidos y sus
territorios".[7]

Dicha carta demuestra, a todas luces, que la razón del
despido del señor Jiménez Soto fue su alegado cambio de
estatus migratorio; en particular, la expiración de su
tarjeta de residencia permanente.[8] Ello, no empece a que,
según la regulación legal federal pertinente,[9] la expiración

---

[7] Apéndice de la *Petición de certiorari*, pág. 115.

[8] Sky Caterers también planteó como razón para justificar el despido del señor Jiménez Soto que este último no pudo tramitar una identificación para obtener acceso al aeropuerto. Sobre esto, el referido trabajador probó que no realizaba sus funciones en el aeropuerto, sino que en otro edificio. En consecuencia, la tarjeta de identificación para acceder al aeropuerto era innecesaria.

[9] En particular, el Subcapítulo B del Título 8 del *Code of Federal Regulations* establece:

Subpart B- Employment Authorization

Section 247a.12 Classes of aliens authorized to accept employment.

(a) *Aliens authorized employment incident to status*. Pursuant to the statutory or regulatory reference cited, the following classes of aliens are authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission or subsequent change to one of the indicated classes. Any alien who is within a class of aliens described in paragraphs (a)(3), (a)(4), (a)(6) - (a)(8), (a)(10) -(a)(15), or (a)(20) of this section, and who seeks to be employed in the United States, must apply to US Citizenship and Immigration Services (USCIS) for a document evidencing such employment authorization. USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an alien's authorization to work in the United States.

**(1) An alien who is a lawful permanent resident (with or without conditions pursuant to section 216 of the Act), as evidenced by Form I-551 issued by the Service [Green card]. An expiration date on the Form I-551 reflects only that the card must be renewed, not that the bearer's work authorization has expired.** (Énfasis suplido). 8 CFR sec. 274a.12.

Asimismo, el Formulario I-9 incluye el siguiente aviso:

de la tarjeta de residencia permanente del referido trabajador no significaba que su autorización para trabajar también había expirado, sino meramente que éste venía llamado a renovar dicho documento.

Ahora bien, aun si concluyéramos que la aludida carta no representa evidencia directa y que, por consiguiente, era forzoso aplicar el esquema probatorio de *McDonnell Douglas Corp. v. Green*, *supra*, el resultado sería el mismo. En otras palabras, a nuestro juicio, el señor Jiménez Soto logró establecer un caso *prima facie* de discrimen.

En específico, el referido trabajador evidenció que: (1) pertenece a una clase protegida por la Ley Núm. 100, *supra*, (bajo las cláusulas de *origen social*, *condición social* y *origen nacional*); (2) estaba cualificado para el puesto, pues obtuvo una recomendación favorable luego de su entrevista y, posteriormente, fue contratado; (3) fue despedido por razón de que su tarjeta de residencia permanente expiró; y (4) hubo un trato más favorable, -- la retención del empleo --, hacia trabajadores en una situación similar a la suya y no pertenecientes a la clase protegida.

---

Aviso contra la discriminación: Todos los empleados pueden elegir qué documentación aceptable presentarán para el Formulario I-9. Los empleadores no pueden solicitar a los empleados documentación para verificar la información de la Sección 1, ni especificar qué documentación aceptable deben presentar para la Sección 2 o el Suplemento B, Reverificación y Recontratación. Tratar a los empleados de manera diferente según su ciudadanía, estatus migratorio u origen nacional puede ser ilegal. *Verificación de elegibilidad de empleo (Formulario I-9)*, Departamento de Seguridad Nacional, Servicio de Ciudadanía e Inmigración de los Estados Unidos, disponible en https://www.uscis.gov/sites/default/files/document/forms/i-9-spanish.pdf.

Probado lo anterior, le correspondía a Sky Caterers presentar evidencia que razonablemente justificara el despido. La referida compañía, según discutimos, no cumplió con ello.

En suma, coincidimos con los foros inferiores en cuanto a que Sky Caterers actuó de forma discriminatoria al despedir al señor Jiménez Soto **sin corroborar si, en efecto, éste no estaba autorizado para trabajar en los Estados Unidos y sus territorios.** En consecuencia, entendemos que los errores señalados no se cometieron.

III.

Por no ser éste el curso de acción seguido por una mayoría de este Tribunal, respetuosamente disentimos.

Ángel Colón Pérez<br>Juez Asociado